EMILIO ANTONIO MELÉNDEZ, conocido por EMILIO CIVIDANES, menor de edad representado por su madre con patria potestad, MARÍA MELÉNDEZ, demandante y apelado, *v.* EMILIO CIVIDANES, demandado y apelante.

Núm. 8734.—*Sometido:* Noviembre 29, 1943. *Resuelto:* Febrero 1, 1944.

---

*Dubón & Ochoteco* y *Otero Suro & Otero Suro,* abogados del apelante; *Carlos D. Vázquez,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Este recurso se estableció contra la sentencia que declaró a Antonio Meléndez hijo natural reconocido del apelante y condenó además a éste al pago de las costas y $150 por concepto de honorarios de abogado. Se basa el recurso en que la prueba es insuficiente para sostener la sentencia y en que la defensa de cosa juzgada debió haber prosperado.

La prueba es contradictoria. La del demandante puede exponerse así: Allá para el año 1923, María Meléndez, joven de dieciséis años de edad, trabajaba como cajera en el restaurante "La Mallorquina" de esta ciudad. Frente a dicho establecimiento había un depósito de calzado donde trabajaba Emilio Cividanes, quien para aquella fecha con-

taba unos cuarenta años de edad. Cividanes, quien frecuentaba mucho "La Mallorquina", conoció a María y la requirió de amores. En mayo de 1923 ya eran novios y juntos paseaban e iban al cine, al parque y a otros sitios públicos. En el mes de agosto siguiente, él la invitó para que fuese a su casa en la Calle Luna número 59 para conocer sus familiares. Ella accedió, pero al llegar a la casa encontró que la única persona que allí había era Cividanes. Aprovechando la circunstancia de hallarse solos, la sedujo bajo promesa de matrimonio. Dos o tres días después fué a vivir con ella públicamente en una habitación que alquiló a Joaquín Rodríguez en la calle del Sol número 40. Quedó encinta la joven y notó entonces que Cividanes trataba de repudiarla, llevándose su ropa de la casa. Al descubrir los planes de su amante, María fué a la fiscalía de San Juan, donde por hallarse ausente el fiscal, informó a su taquígrafo, Sr. Jesús Díaz Paradizo, de la seducción de que había sido objeto. Éste lo citó, y el día fijado, al llegar Cividanes a dicha oficina, encontró allí a María. Díaz Paradizo puso en conocimiento de Cividanes la imputación que le hacía María y agregó que ella alegaba estar encinta. Cividanes, sin admitir ni negar nada, invitó a María a pasar a la sala de recibo de la fiscalía y solos allí le pidió que retirase la querella, a cambio de lo cual él le ofrecía seguir atendiéndola, lo mismo que al niño cuando naciera. Aceptó ella y juntos volvieron a la sala donde había permanecido Díaz Paradizo, imponiéndole del acuerdo a que habían llegado y expresando ella su resolución de desistir de la querella. Continuaron viviendo juntos. Dos o tres meses antes del nacimiento del niño Cividanes fué con María donde Luisa Sierra, enfermera y comadrona, quien la reconoció y convino en asistirla en el parto. Más o menos en la misma fecha el propio Cividanes habló con Herminia Fuentes para que le preparase el canastillo y al entregarlo terminado él le pagó su trabajo. De la casa número 40 de la Calle Sol se mudaron a otra habitación que alquiló al

policía Carmelo Meléndez en la calle de la Luna número 98. Mientras vivían en dicha casa, él embarcó para los Estados Unidos pero le dejó $50, de los cuales $30 eran para el pago de la habitación y $20 para los gastos de ella. Además en poder de Joaquín Rodríguez dejó $20 para satisfacer los honorarios de la comadrona. Llegado el momento del alumbramiento, María ingresó en el Hospital de Maternidad, donde nació el demandante el 30 de junio de 1924. Para esa fecha, después de un mes de ausencia, regresó él de Estados Unidos. El niño cogió una infección en los ojos y en el ombligo, por lo cual volvió Cividanes a requerir los servicios de Luisa Sierra, quien lo curó y recibió de él el pago de sus honorarios, montantes a $10. Teniendo el policía Meléndez que mudarse con motivo de ciertas reparaciones de que iba a ser objeto la casa, Cividanes y María se mudaron a una habitación en la casa de la viuda de Cordero, en la calle San José número 6, y algún tiempo después se trasladaron a la casa de Pablo Pollet, en la calle O'Donnell de esta ciudad. Cuando fueron a alquilar la habitación a Pollet, Cividanes acompañó a María y al niño, y fué él quien contrató la habitación. Allí vivieron por algún tiempo. En el año 1925 María instó un pleito de filiación contra Cividanes, el cual terminó con sentencia a favor del demandado a base de una moción de *nonsuit*. No obstante el pleito, siguieron viviendo juntos hasta que en 1926 Cividanes contrajo matrimonio con su actual esposa. Desde entonces María trabajó en distintos sitios para mantenerse ella y su hijo. Cuando el niño estaba en quinto o sexto grado en la Escuela José Julián Acosta, la principal de dicha escuela, Sra. Inés Encarnación Santana, fué a comprar un par de zapatos a la tienda del demandado y al salir del establecimiento le dijo ella que en su escuela había un hijo de él que era un muchacho muy bueno, a lo que repuso el demandado que se alegraba y expresó la natural satisfacción que siente todo padre cuando se dice algo que enaltece a su hijo. Más tarde, durante el

mismo curso escolar, con motivo del homenaje a la vejez, la misma principal escribió a Cividanes una carta solicitando su ayuda para los ancianos y la envió con el demandante. En la carta le hacía referencia a su hijo. El niño se la entregó y gustosamente contribuyó Cividanes con un par de chinelas. Declaró además el demandante que en distintas ocasiones fué donde su padre al establecimiento y éste lo recibía con cariño, lo besaba y lo presentaba a todos como su hijo. Parece conveniente agregar que las personas mencionadas declararon todas como testigos de la demandante, corroborando la narración de estos hechos en lo que a cada una concierne. Todos, con excepción de Díaz Paradizo, declararon sobre actos y manifestaciones del demandado, tendentes a establecer el *status* de hijo natural en que el demandado tenía al demandante.

La prueba del demandado consistió de su propia declaración y de la de María, quien fué llamada con el propósito de presentar una carta suscrita por ella tendente aparentemente a impugnar su declaración, y para examinarla además en relación con los autos en el caso anterior de filiación, civil número 3543, al cual nos referimos más adelante al discutir la defensa de cosa juzgada.

El demandado no negó haber conocido a María mientras trabajaba en ''La Mallorquina'' y expresamente admitió haber tenido relaciones sexuales con ella y haberla acompañado al cine, sentándose a su lado. Admitió también haber sido citado a la fiscalía y que se comprometió a ayudarla a ella y al niño; que en efecto la ayudó, aunque para ello se valía de otras personas de manera que no hubiera evidencia contra él. Pero declaró que él nunca había vivido públicamente con María Meléndez; que no era el padre del demandante ni jamás él había hecho las demostraciones de cariño que todos los testigos, con excepción de Díaz Paradizo, le atribuyen. Finalmente declaró él que ayudaba a María y a su hijo simplemente como un acto de bondad y para evitar

dificultades. Para corroborar su declaración presentó en evidencia una carta suscrita por María Meléndez, que apareció en los autos del pleito anterior y la que literalmente dice:

"Amigo Emilio: tengo que decirte y pedirte un favor por la desgracia que he tenido mi familia me botó de casa y me encuentro sin familia y sin nadie en este mundo. Si tú pudieras prestarme o pagarme una habitación hasta que yo salga de esto que después yo te devolveré, tan pronto trabaje. El padre del muchacho se fué y no se acordó más de mí. Y Ud. como es el único amigo que puedo ocuparlo en mi desgracia le suplico que me ayude en lo que pueda hasta que salga de esto, y si el padre del muchacho me manda dinero se lo devolveré seguido o si no cuando trabaje. Hágalo Ud. por lo que más quiera que Dios se lo pagará. No deje de ayudar a una muchacha desgraciada que no tiene familia y Ud. es el único amigo que puede ayudarme; no le pido que me ayude mucho, que si puede me pague la habitación si no tendré que matarme. El padre del muchacho está en Santo Domingo, no me mandó ni un centavo para poderme ayudar a mí misma. Tenga compasión de mí y ayúdeme que algún día se lo podré pagar.

Su amiga María.

Yo pasaré a buscar la contestación o lo llamaré por teléfono."

Al ser presentada dicha carta a María Meléndez, admitió que ella la había escrito; pero que se la dictó el demandado quien le exigió que la escribiera como condición de seguirla ayudando; que como ella se resistía a escribirla, el demandado sacó un revólver y lo puso a su lado y le dijo que si ella no escribía lo que él le dictaba se pegaría un tiro, y ante esa amenaza, la escribió. Negó, sin embargo, que fuera la verdad lo que decía la carta y aseguró que el demandado había sido el único hombre con quien ella había sostenido relaciones. El propio demandado expresamente declaró que María era "una buena muchacha", que estaba muy enamorada de él; y que en efecto aquella carta se la había exigido por consejo de su amigo el abogado Enrique Rincón Plumey, quien le había dicho que con esa prueba en su poder estaba protegido contra cualquier pleito que María tratase de presentar en contra suya.

Del pleito anterior presentó además en evidencia la demanda original, la enmendada, la contestación y la sentencia, todo ello con el propósito de probar su defensa de cosa juzgada. Dicho pleito de filiación fué instituído por "Marcos Meléndez, representando a su hija menor María Meléndez Açosta", y lleva el número 3543 de los pleitos civiles radicados en la Corte de Distrito de San Juan, Primer Distrito. La demanda original fué radicada el 29 de octubre de 1924, y fué abogado del demandante el Sr. Manuel Moraza.

Al presentarse en evidencia dichas alegaciones del pleito número 3543, el demandado llamó la atención a la corte al párrafo quinto de la demanda original y de la demanda enmendada, donde se alega que "aun cuando su ya citada hija María Meléndez no ha vivido en público y notorio concubinato con el demandado Emilio Cividanes . . ."

Tal fué en síntesis la prueba que ante sí tuvo la corte sentenciadora. Convenimos con el apelante en que ciertas porciones de la evidencia del apelado son inverosímiles. Empero, la experiencia nos enseña que raro es el caso donde la evidencia testifical predomina, en que la evidencia de una y otra parte se ajuste estrictamente a la verdad. Y es que por lo general la verdad se halla distribuída entre ambas partes. Frecuentemente el testigo oculta o desfigura determinados hechos y, conscientemente unas veces e inconscientemente otras, los exagera o trata de imprimirles cierto colorido favorable siempre al litigante que lo ha traído a declarar. Pero así es y será siempre la naturaleza humana. Por eso en la apreciación de la prueba, en esa difícil etapa del proceso judicial, es donde el juez debe poner a contribución su conocimiento de la vida y de la naturaleza humana, para con arreglo a los dictados de una sana y juiciosa crítica, discernir lo verdadero de lo falso, lo verosímil y racional de lo dudoso e improbable, sin perder de vista las circunstancias todas en que se hayan desenvuelto los hechos declarados. Desentrañada así la verdad, tomando lo que haya de

cierto en la evidencia de una y otra parte, fácil le será las más de las veces determinar a qué lado favorece la preponderancia de la prueba.

Es en extremo raro el pleito de filiación donde no se presenta al supuesto padre deseoso de asegurar a toda persona que se encuentre en su camino que él es el padre del hijo que se le imputa, que lo quiere mucho, que lo va a educar, y a veces, como en este caso, lo describen bañando y cambiando los pañales al hijo en presencia de personas extrañas, tratando así de demostrar actos de paternidad. Pero en el presente caso no abrigamos duda que el demandado requirió de amores a la madre del demandante, que ella, enamorada de él, se dejó seducir por sus falsas promesas, que vivieron en concubinato ocupando habitaciones en distintas casas de la ciudad, que como resultado de esas relaciones nació el demandante, y que al tiempo en que el demandante fué concebido sus padres eran solteros y se hallaban en aptitud de contraer matrimonio.

La carta que admitió el juez en evidencia no controvierte en forma o manera alguna la prueba del demandante. Conocemos su origen y el motivo que la inspiró y eso basta para desacreditarla como medio de prueba.

Por último, la admisión que aparece en la demanda original y en la enmendada en el pleito número 3543 no controvierte las declaraciones de María Meléndez y sus testigos en lo que respecta al concubinato. Aparte de que dicho pleito fué instituído a nombre de Marcos Meléndez, padre con patria potestad entonces sobre María Meléndez, dichas demandas no fueron juradas ni suscritas por María Meléndez ni fué ella quien suministró al abogado Moraza los hechos que se expusieron en dichas dos demandas. Wigmore *on Evidence,* 3a ed., sec. 1066; 3 Jones *on Evidence,* 4a ed., sección 272, pág. 511.

2. Pasemos ahora a la defensa de cosa juzgada.

■ La defensa de cosa juzgada está inspirada en la necesidad de poner fin a los litigios. De ahí que para poderla invocar con éxito no sólo precisa la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron, si que también que la sentencia anterior por su naturaleza o por disposición de la ley resuelva definitivamente el asunto. A este efecto dice Manresa:

"Además, la sentencia debe ser definitiva, sin permitir, por su naturaleza y la del juicio en que se dicte, la apertura de otro sobre el mismo asunto, pues en este caso tendría aplicación la doctrina formulada en sentencia de 14 de junio de 1884 y 6 de mayo de 1886..." 8 Manresa (2a ed., 1907, pág. 583).

■■ La sentencia del pleito anterior invocada por el demandado fué dictada, ya hemos dicho, a virtud de una moción de *nonsuit,* y ésa, como veremos, es una sentencia que por su naturaleza no impide que se establezca otro pleito entre las mismas partes o sus causahabientes sobre el mismo asunto. Esto es así porque la moción de nonsuit participa de la índole de una excepción previa dirigida contra la suficiencia de la prueba presentada por el demandante. La sentencia de nonsuit sólo resuelve que aceptando como cierta la prueba presentada por el demandante, dicha evidencia es insuficiente para probar la causa de acción ejercitada, pero no prejuzga los méritos de la acción. No impide, por consiguiente, que después de dictada la sentencia de nonsuit y dentro del término prescriptivo, se inste de nuevo el pleito y que si la evidencia que entonces se presente para sostener las alegaciones es suficiente, obtenga el demandante sentencia a su favor. A veces se da el caso de que declarada sin lugar una moción de nonsuit, el demandado somete la contención por los méritos de la prueba presentada por el demandante y la corte, al apreciar la misma evidencia, al pasar sobre la credibilidad de los testigos del demandante, en el ejercicio de su discreción en la apreciación de la prueba, dicta una sentencia por los méritos a favor del demandado. *Haldeman*

v. *U. S.*, 91 U. S. 584, 23 L. ed. 433; *Biurrum* v. *Elizalde* (Cal., D.C.A., 1925) 242 P. 109, 113; *Restatement of the Law of Judgments*, §53, pág. 207.

Existe una excepción a la regla enunciada y es que cuando de la prueba aducida por el demandante surge afirmativamente que éste como cuestión de derecho no debe obtener un fallo a su favor, la sentencia de nonsuit pone fin definitivamente al litigio y equivale a una sentencia en sus méritos. *Bartell* v. *Johnson* (Cal., D.C.A., 1943) 140 P. (2d) 878, y casos citados. Pero no se presentó como prueba la evidencia que tuvo ante sí la corte inferior, para poder determinar si de ella surgía afirmativamente que el demandante no tenía derecho a una sentencia a su favor. La presentación de esa prueba incumbía al demandado, que invoca la defensa de cosa juzgada; el dejar de presentarla no puede perjudicar los derechos del demandante.

Pero además de la naturaleza de la sentencia de nonsuit, que como hemos visto es un impedimento a la defensa de cosa juzgada, los artículos 192 y 193 del Código de Enjuiciamiento Civil (véase la edición inglesa) prescriben que una sentencia de nonsuit no recae sobre los méritos. A este efecto, véase el caso de *Rincon Water & Power Co.* v. *Anaheim Union Water Co.*, 115 Fed. 543, donde se interpretan preceptos del Código de Enjuiciamiento Civil de California similares al 192 y 193 del nuestro.

El apelante invoca la número 41(*b*) de las Reglas de Enjuiciamiento Civil, dispositiva de que una sentencia de nonsuit y cualquier otra desestimación no provista por dicha Regla, excepto la que se hubiese dictado por falta de jurisdicción, tienen el efecto de una adjudicación en los méritos. Pero la número 86 de las Reglas citadas, prescribe que las mismas entrarán en vigor el primero de septiembre de 1943 y que ''se regirán por ellas todos los procedimientos en acciones iniciadas *después* que las mismas hayan empezado a regir, y también todos los procedimientos subsiguien-

tes en acciones que estuvieren pendientes . . ." Mas como la sentencia del pleito anterior fué dictada en 11 de marzo de 1925, es obvio que la Regla de Procedimiento Civil no tiene aplicación.

*Siendo suficiente la evidencia y no procediendo la defensa de cosa juzgada invocada por el demandado, debe confirmarse la sentencia apelada.*