GERARDO JORGE RODRÍGUEZ ET AL., demandantes y recurridos, v. SUCESIÓN DE NEREO PIRAZZI, compuesta de sus hijos JOSEFINA y RAFAEL PIRAZZI, demandados y recurrentes.

*Número*: 12407 *Resuelto*: 5 de diciembre de 1963

508

*José Guillermo Vivas,* abogado de Josefina Pirazzi de Méndez; *E. Martínez Rivera,* y *E. Martínez, Jr.,* abogados de Rafael Pirazzi; *Guillermo S. Pierluisi,* y *R. Hernández Colón,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El 5 de mayo de 1928 Juana Rodríguez Morales y su hijo Gerardo Jorge Rodríguez eran dueños de una estancia de café llamada "la Molina", ubicada en el Barrio Tibes de Ponce, con capacidad de 264 cuerdas y 25 céntimos dedicadas en su mayor parte al cultivo de café y el resto a frutos menores, pastos y malezas, con varias edificaciones, casas, maquinaria y establecimientos propios para la faena agrícola. En esa fecha, y con el consentimiento de Andrea Rodríguez, la esposa de Gerardo Jorge, ellos constituyeron hipoteca sobre ésta y dos fincas más a favor de Nereo Pirazzi en garantía de un préstamo de $27,000, de sus intereses hasta la suma de $3,000 en adición a los garantizados por ley, y de $800 para costas y honorarios en caso de ejecución. Respondió la estancia "La Molina" de $23,000 del principal, de $2,500 de los intereses y de $600 del crédito para ejecución. La hipoteca se constituyó por término de 4 años a vencer el 5 de mayo de 1932, concediéndose a los deudores hipotecarios el derecho a

cuatro prórrogas de un año cada una a partir de dicho vencimiento siempre y cuando hubieran satisfecho los intereses vencidos y hubieran pagado las primas del seguro correspondiente a los términos de prórroga. Se acordó que el préstamo devengaría intereses al 10% anual pagaderos por semestres adelantados. Si los deudores dejaban de satisfacer dos semestres de intereses en la suma convenida por adelantado, ello daría derecho al acreedor a considerar vencida toda la deuda y a proceder a su cobro. También fue acuerdo que los deudores deberían mantener asegurada la cosecha de café durante todo el tiempo de la hipoteca y sus prórrogas por una suma no menor de $20,000 y el no cumplimiento de esta obligación daría por vencida la deuda con derecho el acreedor a proceder al cobro de la misma. Todo lo anterior se hizo constar en la escritura Núm. 61 otorgada en Ponce el 5 de mayo de 1928 ante el Notario Cipriano Olivieri. La hipoteca se inscribió en el Registro de la Propiedad el 14 de junio de 1928.

El 10 de abril de 1930 los deudores hipotecarios y el acreedor Pirazzi suscribieron un contrato de anticresis en el cual, después de hacer un relato de la anterior hipoteca, expusieron, convinieron y se obligaron bajo los siguientes pactos, que preferimos exponer en forma literal más bien que relacionarlos por cuanto constituyen dicho contrato de anticresis y sus acuerdos el hecho jurídico fundamental que gobierna la decisión de la cuestión litigiosa envuelta en este pleito:—

"........QUINTO:—Manifiestan los señores Gerardo Jorge y Juana Rodríguez Morales, que se hallan vencidos desde el día cinco de mayo de mil novecientos veintinueve, dos semestres de intereses en la forma convenida, esto es, por adelantado, y al tipo estipulado en dicho contrato hipotecario, sobre el capital de VEINTE Y TRES(*) DOLLARS de que responde la finca número dos. Estos dos semestres sumados montan a la cantidad de MIL NOVECIENTOS DIEZ Y SEIS DOLLARS sesenta y siete centavos. ................................................................................

---

(*) $23,000.

"........Asismismo se hallan vencidos dos semestres de intereses al tipo y en la forma convenida en dicha hipoteca del capital de CUATRO MIL DOLLARS de que responde la finca descrita bajo el número uno ..................................................................................................

"........SEXTO:—Que habiendo los comparecientes Don Gerardo Jorge Rodríguez, con el expreso consentimiento de su esposa doña Andrea Rodríguez, y Doña Juana Rodríguez Morales, convenido con el otro compareciente don Nereo Pirazzi, un contrato de ANTICRESIS sobre las fincas antes descritas bajo los números dos y tres, a *fin de que este señor se pueda cobrar de lo que cada una de ellos produce y produzca en lo sucesivo,* lo que más adelante se especificará, llevan a cabo dicho contrato por la presente escritura y de acuerdo con las siguientes cláusulas: .........................

............................................... PRIMERA ...................................................

"................ DON GERARDO JORGE RODRIGUEZ, con el expreso consentimiento de su ·esposa doña ANDREA RODRI-GUEZ, que aquí lo consigna y DOÑA JUANA RODRIGUEZ y MORALES, por la presente DAN EN ANTICRESIS a don NEREO PIRAZZI, las fincas antes descritas bajo los números DOS [**] y TRES de esta escritura, para que las administre y perciba las rentas que producen y produzcan en lo sucesivo dichas dos fincas, y con esas rentas haga pago completo en el orden siguiente: ..................................................................................

"................EN PRIMER LUGAR:—De los gastos de refacción, cultivo y limpieza y recolección de frutos de las fincas anteriormente descritas bajo los números dos y tres; gastos de reparación de los establecimientos existentes en dichas dos fincas, y gastos de construcción de los edificios o construcciones que fueren necesarias, a juicio de don Nereo Pirazzi, en cualquiera de las fincas referidas; del importe de las contribuciones de dichas fincas, vencidas o por vencer; de los gastos de otorgamiento e inscripción de esta escritura en el Registro de la Propiedad, inclusive todo gasto conducente a este fin en que incurriere don Nereo Pirazzi; y todo gasto tendiente a hacer eficaz en la práctica todas y cada una de las cláusulas de este contrato; primas y gastos de aseguro de cualquier índole de los establecimientos, cultivos y cosechas de dichas dos fincas; los intereses al doce por ciento anual

_____

(**) La finca número dos es "La Molina" que fue también descrita en este documento.

512

del dinero que para todas estas atenciones suministre don Nereo Pirazzi. ..........................................................................................

"EN SEGUNDO LUGAR: Una vez cubiertas las atenciones y obligaciones antes referidas, el REMANENTE, si alguno hubiere, se destinará a pagar parcial o totalmente, según fuere su montante, la cantidad de MIL NOVECIENTOS DIEZ Y SEIS DOLARES sesenta y siete centavos adeudados al señor Pirazzi por concepto de dos semestres vencidos por adelantado según se expresa al hecho quinto de esta escritura. ......................

"EN TERCER LUGAR: Cubiertas aquellas y estas atenciones y obligaciones, SI ALGUNO hubiere, se destinará a cubrir parcial o totalmente, conforme a su cuantía, los intereses vencidos en la forma y al tipo convenido en la hipoteca antes mencionada sobre la cantidad de VEINTE Y TRES MIL DOLLARS de que responde la finca descrita con el número dos. ....................

"...........................Y EN ULTIMO LUGAR:—Pagadas y satisfechas total y cabalmente todas las atenciones y obligaciones antes reseñadas, el REMANENTE, si alguno hubiere, se aplicará al pago de todo o parte (de acuerdo con su cuantía) del capital de VEINTE Y TRES MIL DOLLARS que grava dicha finca número dos. .......................................................

.................................... SEGUNDA ....................................
"..................................... El término de este contrato de ANTICRESIS durará todo el tiempo absolutamente necesario e indispensable para dejar cubierto el montante total de los gastos, intereses y créditos relacionados en la cláusula anterior.

.......................................................................................

.................................... TERCERA ....................................
"...........................DON NEREO PIRAZZI deberá todos los días TREINTA DE JUNIO y TREINTA Y UNO DE DICIEMBRE DE CADA AÑO, cerrar las operaciones de contabilidad en el libro o libros, que, de los ingresos y egresos en la administración de dichas dos fincas, habrá de llevar; pudiendo los señores don Gerardo Jorge Rodríguez y doña Juana Rodríguez Morales examinarlos desde las ocho de la mañana hasta las cinco de la tarde de dicho día en la oficina del señor Pirazzi. .......................

.................................... CUARTA ....................................
"........................ Es expresamente convenido que don Gerardo Jorge y Rodríguez y doña Juana Rodríguez y Morales no podrán readquirir el goce de las dos fincas aquí dadas en anticresis, sin haber pagado antes, enteramente, a don Nereo Pirazzi, los gastos,

intereses y créditos que se dejan referidos en la cláusula primera de esta escritura; no obstante el señor Pirazzi puede obligar a dichos deudores hipotecarios a que entren de nuevo en el goce y posesión de dichas fincas, o de cualquiera de ellas en cualquier momento. ........................................................................................

................................................ QUINTA ........................................

"............................. Los comparecientes don Gerardo Jorge Rodríguez y doña Juana Rodríguez y Morales conceden por la presente al señor Nereo Pirazzi facultades expresas e irrevocables hasta la terminación de este contrato, para que a nombre y representación de ellos tome a préstamo de la Porto Rico Hurricane Relief Commission las cantidades que estuviere ésta dispuesta a conceder; facultándose también expresamente por dichos comparecientes al señor Pirazzi, para que en garantía de dicho préstamo constituya hipoteca sobre todas o cualesquiera de las dos fincas dadas por la presente en anticresis y que se describen bajo los números dos y tres a favor de la referida Comisión Rehabilitadora. Asimismo dichas personas facultan expresamente al señor Pirazzi para que a nombre de ellas tome a préstamo a cualquier institución bancaria la cantidad o cantidades de dinero que necesite, garantizando dicho préstamo con hipoteca sobre dichas propiedades. .............................

.................................................. SEXTA ........................................

"............................. El señor Pirazzi podrá ceder o traspasar sus derechos y facultades otorgadas en este contrato libremente; pero si por el contrario el señor Jorge Rodríguez y la señora Rodríguez Morales desearen vender y vendieren todas o cualesquiera de dichas propiedades, objeto de este contrato, tendrán que notificarlo al señor Pirazzi, y el producto que obtuvieren de dicha venta o ventas vienen dichos señores obligados a abonarlo a cuanto la finca o fincas así vendidas estuvieren respondiendo de la hipoteca referida anteriormente y sus intereses vencidos en la forma estipulada en ésta. ........................

.............................................. SEPTIMA ........................................

"............................. Es expresamente convenido por los aquí contratantes que este contrato no habrá de entenderse en forma alguna como parte, ni como modificación en ningún particular de lo estipulado en la hipoteca referida al hecho segundo, tercero y cuarto de esta escritura, la cual seguirá en todo su vigor y eficacia como si este contrato no existiera; ni debe entenderse este contrato en el sentido de impedir en forma alguna a don

514

Nereo Pirazzi capitalizar los intereses vencidos en la forma convenida, del capital de que responde cada finca de las dos objeto de este contrato, siempre que lo producido por las mismas no bastare a cubrirlos totalmente.—Esto es, si los productos no cubrieren más que parte de dichos intereses, lo restante en descubierto se capitalizará.—Si no alcance ni parte de dichos intereses, se capitalizarán éstos en totalidad. ...............................

.............................................. OCTAVA .....................................

"............................... Aclaran los aquí comparecientes que la cantidad de MIL NOVECIENTOS DIEZ Y SEIS DOLLARS sesenta y siete centavos, mencionada en el hecho quinto y en la cláusula primera de esta escritura, no es el importe total de los dos semestres de intereses vencidos, desde cinco de mayo de mil novecientos veinte y nueve, sino que es el importe que se está adeudando por los señores don Gerardo Jorge y doña Juana Rodríguez de dichos dos semestres, después de un abono hecho por el señor Jorge al primero de dichos dos semestres. .................

.............................. NOVENA .....................................

"............................... Toda diferencia que surgiere entre los aquí contratantes en relación con el cumplimiento de todo lo consignado en este contrato de anticresis, si los mismos no llegaren a un acuerdo, vendrán obligados a someterse al dictamen de dos amigables componedores designados uno por don Nereo Pirazzi, y el otro por los demás comparecientes; estipulándose que en caso de que estos amigables componedores no llegasen a un acuerdo, podrán éstos designar una tercera persona que resuelva las diferencias surgidas; siendo el deseo expreso de los comparecientes, y así lo convienen, en que dichas diferencias no deberán ser sometidas en ningún caso a los tribunales de justicia. ..........................................

.............................. DECIMA .....................................

"............................... Es convenido asimismo que los herederos, sucesores y cesionarios de los comparecientes en este contrato vendrán obligados a respetar todas y cada una de sus cláusulas."

Los anteriores pactos y cláusulas se suscribieron por escritura Núm. 21 otorgada en Ponce el 10 de abril de 1930 ante el propio Notario Sr. Olivieri. Hizo constar el Notario que los contratantes quedaron bien impuestos de los Arts. 1782 al 1787, 1761 y 1762 del Código Civil, todos los cuales

fueron transcritos en el cuerpo de la escritura. El contrato de anticresis se inscribió en el Registro de la Propiedad el 6 de mayo de 1930.

El 6 de marzo de 1931, en plena vigencia del contrato de anticresis, sin que el mismo hubiera sido rescindido, terminado o liquidado, encontrándose el acreedor Nereo Pirazzi en posesión, goce y disfrute de la finca "La Molina" en virtud del referido contrato, acudió a la entonces Corte de Distrito de Ponce, Caso Civil Núm. 5734, en ejecución sumaria de la hipoteca antes referida en cuanto a "La Molina".[1] Interpuso el pleito contra los deudores Juana Rodríguez Morales y Gerardo Jorge y contra los siete hijos menores de éste por haber fallecido su esposa Andrea Rodríguez. En el escrito inicial invocó el acreedor, como únicos motivos, el incumplimiento de las cláusulas tercera y quinta de la hipoteca que le confirieron el derecho de ejecutar la misma, antes de su vencimiento, por falta del pago por adelantado de dos semestres de intereses y por falta del pago del seguro del cosecho. Alegó que los deudores debían $2,684 de intereses por dos semestres y que además habían dejado de cumplir con la referida cláusula quinta en cuanto al seguro. Hizo referencia a la constitución de la anticresis y acompañó una copia del contrato con el escrito inicial. Invocó la cláusula de dicho contrato en el sentido de que el mismo no debería entenderse como parte o como modificación de la hipoteca constituida. En vista del escrito inicial, el 11 de marzo de 1931 se dictó Auto requiriendo a los deudores al pago del principal de $23,000, de los intereses desde *el 5 de mayo de 1929* y hasta una suma de $2,500, y de $600 para costas.

Como consecuencia de estos procedimientos, en 2 de junio de 1931 el acredor Nereo Pirazzi, estando en posesión, uso y disfrute de la finca en virtud del contrato de anticresis, se

---

[1] El remanente del crédito hipotecario garantizado con otra finca había sido cedido por Pirazzi a un tercero, y éste ya lo había ejecutado sobre esa otra finca.

adjudicó "La Molina" en pública subasta. Como consecuencia de los mismos y del título adquirido por Pirazzi en venta judicial, acreditado en la escritura Núm. 57 de 24 de julio de 1931 ante el Sr. Olivieri, el 15 de agosto de 1931 quedó cancelada la hipoteca por confusión de derecho, y se canceló también, por confusión de derecho, el contrato de anticresis.

Nereo Pirazzi falleció bajo testamento el 16 de marzo de 1934 estando en posesión de la estancia, y dejó como únicos y universales herederos a sus hijos, demandados en esta acción, Josefina y ,Rafael Pirazzi. En la distribución de la herencia, en pago de su participación hereditaria se adjudicó "La Molina" al codemandado Rafael Pirazzi en virtud de sentencia dictada por la Corte de Distrito de Ponce en pleito sobre nulidad e inexistencia de reconocimiento y otros extremos.

El 19 de diciembre de 1955 el deudor hipotecario Gerardo Jorge y sus siete hijos, como herederos de su esposa fallecida, y la Sucesión de la otra deudora hipotecaria Juana Rodríguez, interpusieron este pleito contra los codemandados Josefina y Rafael Pirazzi, sucesores del acreedor Nereo Pirazzi. Pidieron la nulidad del procedimiento sumario ejecutivo, la devolución de "La Molina", y de los frutos producidos. Los demandados contestaron por separado la demanda; ambos negaron los hechos conducentes a la nulidad del procedimiento hipotecario; ambos levantaron ciertas defensas especiales y ambos interpusieron idénticas contrademandas alegando que para el caso de una declaración de nulidad del procedimiento ejecutivo sumario, y antes de que se les pudiera exigir la devolución y entrega de la finca, los demandantes debían resarcirles la cantidad de $23,000 de principal del préstamo garantizado con hipoteca, sus intereses al 10% anual desde el 5 de mayo de 1929 y la suma de $500,000 para reembolsarles el valor de las mejoras realizadas en la finca, las contribuciones pagadas, los gastos de conservación y administración y el valor de los servicios y del tiempo invertido por los

demandados y su causante desde que tomaron posesión de la finca como dueños de buena fe.

Posteriormente el demandado Rafael Pirazzi interpuso una defensa especial adicional alegando que en el caso Núm. 6321 del anterior Tribunal de Distrito de Ponce, seguido por los deudores hipotecarios Juana Rodríguez y Gerardo Jorge contra el acreedor Nereo Pirazzi y Cipriano Olivieri en relación con los mismos hechos envueltos en este pleito, dicho Tribunal de Distrito dictó sentencia en 10 de mayo de 1933 sobreseyendo y archivando el pleito por abandono de las partes, sentencia que se convirtió en firme y no ha sido anulada ni dejada sin efecto, y que tiene entre las partes el alcance de cosa juzgada. Al comenzar la vista del caso en sus méritos la codemandada Josefina Pirazzi hizo suya también dicha defensa especial adicional.

Después de unas extensas y pormenorizadas conclusiones de hecho elaboradas mediante un detallado análisis de toda la prueba aducida, la Sala sentenciadora falló en derecho decretando la nulidad del procedimiento ejecutivo sumario, la nulidad de la venta judicial de "La Molina" y del título del acreedor Nereo Pirazzi en virtud de dichos procedimientos y venta judicial, la nulidad de la trasmisión de la finca al codemandado Rafael Pirazzi en pago parcial de su haber hereditario, la nulidad de las inscripciones pertinentes en el Registro de la Propiedad, y ordenó la devolución de "La Molina" a los demandantes. Decretó que los demandantes adeudaban a los demandados por concepto de la deuda hipotecaria y sus intereses la cantidad de $109,419.60; que los demandados adeudaban a los demandantes $312,541.11 por razón de frutos y otros extremos que fueron especificados en sus conclusiones de hecho, y en adición a la devolución de la finca, condenó a los demandados a satisfacer a los demandantes la diferencia de $203,030.51 parte no compensada de las mutuas acreencias, los intereses legales sobre esta canti-

dad desde la fecha de la sentencia y $10,000 de honorarios de abogado.

Los codemandados apelaron por separado. En extensos señalamientos de errores ambos atacan con denuedo las conclusiones de hecho y de derecho de la Sala sentenciadora; ambos insisten en la validez del procedimiento ejecutivo sumario; ambos rechazan la condena a ellos en frutos aun cuando dicho procedimiento hubiera sido nulo. No obstante las alegaciones de su contrademanda y lo allí reclamado, la codemandada Josefina Pirazzi hace el planteamiento adicional en cuanto a ella, en lo que a frutos respecta, de no haber estado en posesión de la propiedad desde el año 1935 en que la misma se adjudicó a su hermano.

### La Cosa Juzgada

En 5 de octubre de 1931 se interpuso en la entonces Corte de Distrito de Ponce el pleito Civil Núm. 6321 por Juana Rodríguez Morales y otros como demandantes contra Nereo Pirazzi y Cipriano Olivieri, demandados, sobre nulidad, etc. El referido expediente no fue ofrecido en evidencia por no haberse encontrado. La Sala sentenciadora se negó a admitir prueba *aliunde* de su contenido. No obstante, los demandados presentaron la que tuvieron a bien presentar como parte de un récord especial de prueba ofrecida y no admitida. De esa prueba surge que en dicho pleito se pidió la nulidad del mismo procedimiento ejecutivo sumario a que se refiere la presente acción. Hay en ese récord una certificación de la sentencia que se dictara en el referido pleito Núm. 6321 la cual literalmente dispuso: "Sentencia.—No habiendo tenido progreso este caso por más de un año, por no haberse radicado instancia alguna por ninguna de las partes, las que no han comparecido dentro del término de diez días que se les concedió para alegar razones para que no se decrete el archivo de este caso, y vista la Regla 3 para las Cortes de Distrito en

Asuntos Civiles, se dicta por la presente, sentencia sobreseyendo y archivando este pleito por abandono de las partes, sin especial condenación de costas. Sentencia dictada en Ponce, P.R., 10 de Mayo de 1933, y registrada el mismo día, mes y año.—Certifico (Fdo.) D. Sepúlveda, Juez, Corte de Distrito." (¹ᵃ)

█ Dispone en parte el Art. 1204 del Código Civil, ed. 1930, que contra la presunción de que la cosa juzgada es verdad, sólo será eficaz la sentencia ganada en juicio de revisión; y que para que la presunción de cosa juzgada surta efecto en otro juicio, es necesario que entre el caso *resuelto por la sentencia* y aquél en que ésta sea invocada, concurra la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron. Y véanse Arts. 59(2) y 62 de la Ley de Evidencia. Bajo el derecho aplicable la anterior sentencia por abandono de 10 de mayo de 1933 no produjo estado de cosa juzgada por cuanto no fue al fondo del asunto. *Vega et al.* v. *Rodríguez et al.*, 21 D.P.R. 334 (1914), pág. 343; *Vives* v. *Sucn. Amorós*, 34 D.P.R. 174 (1925), págs. 179, 181; *Balasquide* v. *Luján*, 45 D.P.R. 563 (1933), pág. 577; *Albizu* v. *Royal Bank of Canada*, 46 D.P.R. 503 (1934), pág. 508; *Aguilera* v. *Pérez*, 51 D.P.R. 1 (1937), pág. 3; *Junta Insular de Elecciones* v. *Corte*, 63 D.P.R. 819 (1944), págs. 830, 832; *Muñoz* v. *Pardo*, 68 D.P.R. 612 (1948), pág. 616; *García* v. *Gobierno de la Capital*, 72 D.P.R. 138 (1951), pág. 151; *Chabrán* v. *Méndez*, 74 D.P.R. 768 (1953), pág. 783; *Fels* v. *Biascoechea*, 77 D.P.R. 681 (1954), págs. 684, 685; *Bolker* v. *Tribunal Superior*, 82 D.P.R. 816

---

(¹ᵃ) La Regla 3 mencionada en la sentencia disponía: "Al llamarse el calendario en cada término regular, la Corte, *motu proprio* y previa notificación de, por lo menos, cinco días a las partes, podrá ordenar la desestimación y el archivo de todas las acciones, pleitos y procedimientos pendientes en los cuales no se hubiere hecho progreso alguno o anotádose en el récord, por un período de un año o más, debido a la negligencia de las partes; a menos que esta tardanza se justifique oportunamente a satisfacción del Tribunal."

(1961), pág. 825; *Pérez* v. *Bauzá,* 83 D.P.R. 220 (1961), págs. 224, 225.

■ Sostiene el recurrente Rafael Pirazzi que bajo la Regla 41 (b) de Enjuiciamiento Civil de 1943 la anterior sentencia producía efecto de cosa juzgada ya que este pleito se comenzó estando en vigor dicha Regla, y por ser materia procesal tiene efecto retrospectivo. No tiene razón. Aun cuando se tratara de una cuestión únicamente procesal, que a nuestro juicio no lo es, cf. *Cintrón* v. *Yabucoa Sugar Co.,* 54 D.P.R. 518 (1939), pág. 524, la Regla 41 (b) tuvo su propia cláusula de vigencia: —para ser aplicada a las acciones iniciadas con posterioridad al 1ro. de septiembre de 1943 y a procedimientos subsiguientes en los casos pendientes en esa fecha. *Berdecía* v. *Tyrrell,* opinión Per Curiam (no publicada), de 22 de abril de 1958; *Meléndez* v. *Cividanes,* 63 D.P.R. 4 (1944), págs. 12, 13; *Capella* v. *Carreras,* 57 D.P.R. 258 (1940), pág. 265. Cf. *Souchet* v. *Cosío,* 83 D.P.R. 758 (1961), pág. 762; *Costas Purcell* v. *Tribunal Superior,* 88 D.P.R. 10 (1963). Mal podía un tribunal hacer la reserva que la Regla 41 (b) permite hacer, en una sentencia dictada antes de confeccionarse dicha Regla. Sostiene también el recurrente que la decisión en *Sucn. Rosa* v. *Sucn. Jiménez,* 77 D.P.R. 551 (1954), revocó implícitamente a *Cividanes.* No es así. En *Sucn. Rosa* dijimos, lo cual es correcto, que una sentencia por abandono que no se apeló debía considerarse final y concluyente. No estaba envuelta, ni se resolvió, cuestión alguna de cosa juzgada, aparte de que en ese caso la sentencia de archivo por abandono se dictó en 24 de mayo de 1950, bajo el imperio de la Regla 41 (b).

Aun cuando la Sala sentenciadora hubiera cometido error al no admitir prueba extrínseca sobre la cosa juzgada, cf. *Dávila* v. *P.R. Ry. & P. Co.,* 44 D.P.R. 950 (1933), pág. 959, y aceptando que en el pleito anterior se pidió la nulidad del mismo procedimiento ejecutivo, como cuestión de derecho era improcedente la defensa de cosa juzgada y no cometió error al denegarla.

*La Nulidad*

La validez o nulidad del procedimiento ejecutivo sumario aquí en litigio no descansa sóio en aquellos motivos que de ordinario vemos en los casos decididos, usualmente error o incumplimiento en el trámite procesal en sí o la equivocada exposición de los hechos, cosas estas que por lo regular se han resuelto en una cuestión fundamentalmente de derecho. Las relaciones adicionales de hecho creadas en este caso entre los deudores y el acreedor hipotecario con posterioridad a la hipoteca por razón del contrato de anticresis, íntimamente ligadas a dicha hipoteca como medio encaminado al cobro de la deuda, traen en torno a la validez o a la nulidad del procedimiento hechos jurídicos que requieren particular tratamiento. Para que se entienda porqué la Sala sentenciadora decretó la nulidad, es preciso que puntualicemos muchas de sus conclusiones de hecho, producto de la evidencia documental y testifical, prueba pericial inclusive, según fue apreciada por ella y creída, allí donde hubo conflicto de evidencia.

De acuerdo con esas conclusiones, para la fecha en que se constituyó la hipoteca, 5 de mayo de 1928, "La Molina", de 264.25 cuerdas estaba dedicada principalmente al cultivo de café, y también al de frutos menores; tenía 23 casas de arrimados, un almacén de dos pisos, dos glasis, correderas y maquinaria para la elaboración de café. En cosechas anteriores al año 1928 había producido entre 600 y 700 quintales de café en un cultivo de unas 165 cuerdas solamente.

Para el año 1928 la cosecha de café se estimaba de 600 a 700 quintales y en ese mismo año se ofreció comprar la estancia por un precio de $60,000. Poco después de constituida la hipoteca, en 13 de septiembre de 1928, ocurrió el ciclón de San Felipe. El ciclón destruyó mucha sombra del cafetal, una pequeña parte de los cafetos y las plantaciones de viandas y causó daños a las casas de arrimados, viviendas y almacén. A pesar de dicho ciclón, en 1928 el deudor Gerardo Jorge recogió unos 200 quintales de café. En 1929 se cosecharon 100

quintales. La finca se fue levantando y para abril de 1930 había mucho guineo, chinas y viandas; existía una buena florecida en el cafetal y mucho "millito", granitos pequeños en los arbustos de café.

Por iniciativa y oferta del propio acreedor Nereo Pirazzi las partes suscribieron el contrato de anticresis sobre "La Molina" y dos fincas más, que se transcribe al comienzo, a fin de que Pirazzi *se pudiera cobrar* su crédito hipotecario de lo que cada una de ellas producía y produjera en lo sucesivo. A la fecha en que se otorgó el contrato de anticresis, 10 de abril de 1930, los deudores habían satisfecho los intereses desde la constitución de la hipoteca hasta el 5 de mayo de 1929; no habían satisfecho por adelantado los dos semestres de intereses comprendidos entre el 5 de mayo de 1929 hasta el 5 de mayo de 1930, ascendentes, a razón de 10%, a $2,300. Sin embargo, esta cantidad a esa fecha estaba reducida a $1,916.67 en virtud de un abono de $383.33 hecho por los deudores a cuenta del semestre comprendido entre el 5 de mayo y el 5 de noviembre de 1929.

Como consecuencia del contrato de anticresis Pirazzi entró en la posesión material, uso, goce y disfrute de "La Molina" al siguiente día, 11 de abril de 1930 a todos los efectos de su cultivo, explotación y administración, sin que los deudores tuvieran de ahí en adelante intervención alguna con dicha posesión, cultivo, explotación y administración de la propiedad hipotecada.

Concluyó la Sala que el acreedor hipotecario y también anticresista Nereo Pirazzi recibió desde el 10 de abril de 1930, fecha del contrato de anticresis hasta el 6 de marzo de 1931 cuando inició el procedimiento ejecutivo sumario, las cantidades de $6,000 por concepto de 200 quintales de café recolectados, $1,880 por la venta de frutos menores y carbón, $101 por apacentamiento de ganado y $56 por la renta de una casa de la finca dedicada a escuela, para un total de $8,037. Concluyó también que lo gastado por Pirazzi durante el mismo

período según sus libros y cuenta de anticresis montaba a $4,575.16 pero eliminó, por determinar que no eran gastos propios de administración o para hacer eficaz las cláusulas del contrato según la escritura, la suma de $492.30 que incluía $35, valor de la compra de un caballo; $240 por la compra de cuatro mulas al propio Gerardo Jorge; $23 de la compra de un condominio a una tercera persona; y $194.30 por concepto de radiografías y hospitalización de un tal Fernandini con motivo de una reyerta personal. Eliminados los $492.30 quedó un balance de cargos contra la finca de $4,082.86 que deducidos del ingreso de $8,037.80, arrojaba un saldo a favor de los deudores al iniciarse el procedimiento ejecutivo sumario de $3,954.14. Considerando el pacto del contrato de anticresis al efecto de que las cantidades a suministrarse por el acreedor anticresista devengarían interés al 12% anual, la Sala sentenciadora concluyó que dichos intereses a favor de Pirazzi sobre las partidas de gastos ascendieron a $241.04 que dedujo del balance de $3,954.14 para un sobrante de $3,713.10. Por otra parte, a la suma de $1,916.67 de intereses adeudados al firmarse el contrato de anticresis la Sala adicionó $1,150 de intereses por el semestre del 5 de mayo al 5 de noviembre de 1930 y adicionó la cantidad de $766.67 de intereses entre el 5 de noviembre de 1930 y el 6 de marzo de 1931 fecha de la ejecución, para un total de $3,833.34 de intereses adeudados. Aplicando la Sala dicha deuda de $3,833.34 contra el balance a favor de los deudores de $3,713.10 de lo producido por la finca, concluyó como cuestión de hecho que al iniciarse el ejecutivo sumario hipotecario se debían sólo $120.24 por concepto de intereses y no $2,684 reclamados en el escrito inicial, ni los $2,500 fijados en el auto de requerimiento; y concluyó como cuestión de hecho que el acreedor hipotecario había hecho una falsa exposición en su escrito inicial al alegar que se adeudaban dos semestres de intereses en la cantidad de $2,684 sin especificar a qué dos semestres se refería, cuando sólo se adeudaban $120.24,

utilizando ese hecho como base para la ejecución acelerada de la hipoteca cuyo principal aún no había vencido. (***)

En 15 de diciembre de 1930 falleció Andrea Rodríguez, esposa de Gerardo Jorge, y dejó como su sucesión 7 hijos que en 6 en marzo de 1931 eran todos menores de edad. Concluyó la Sala que para esa fecha el deudor Gerardo Jorge y sus hijos vivían en un estado de extrema pobreza estando dos de sus hijas menores, Luz Virgina y María Isabel, internadas en el Asilo de Niñas Huérfanas de Ponce. En enero de 1931 el deudor Gerardo Jorge requirió en varias ocasiones a Pirazzi para que le rindiera cuenta de la administración de la finca de acuerdo con lo pactado en el contrato de anticresis, cuentas que nunca le fueron rendidas a pesar de que con el fallecimiento de su esposa los menores vinieron a ser deudores hipotecarios y a tener interés en la anticresis. Nunca las cuentas fueron rendidas y por el contrario el día 29 del mismo mes de enero Pirazzi, a través de su abogado, requirió de los deudores el pago total de la hipoteca con sus intereses. El contrato de anticresis nunca fue liquidado ni rescindido, nunca fue cancelado entre las partes y el acreedor anticresista nunca rindió cuentas de los ingresos de la administración aunque sí llevaba en sus libros una cuenta de egresos, nunca notificó, antes de la ejecución, que la finca no produjera frutos, ni en momento alguno, antes de que se la adjudicara como dueño en virtud del procedimiento ejecutivo sumario, requirió a los deudores hipotecarios para que entraran de nuevo en la posesión, uso y disfrute de la hacienda.

Determinó la Sala sentenciadora que el acreedor anticresista Pirazzi no pagó las contribuciones sobre la finca, no llevó libros separados de contabilidad de los ingresos y egresos de su administración sino una llamada "cuenta de anticresis" en los libros de su contabilidad general en la que principalmente anotaba los desembolsos, que no cerró esta cuenta en junio 30 ni al 31 de diciembre de 1930, según lo pactado;

---

(***) Cualesquiera dos semestres de intereses montaban sólo a $2,600.

que algunas partidas por $1,188.28 en dicha cuenta abonadas a favor de los deudores, fueron ingresadas después de comenzada la ejecución y con posterioridad a haberse él adjudicado la finca en pública subasta dentro del procedimiento sumario. Que en violación del contrato de anticresis, no aseguró las cosechas de café para los años de 1930 y 1931, tomando ese hecho luego como el segundo fundamento para ejecutar sumariamente la hipoteca en forma acelerada antes de su vencimiento.

Los hechos anteriormente determinados por la Sala sentenciadora están sustancialmente sostenidos por la evidencia que obra en el récord, según dicha evidencia fuera apreciada y creída por la propia Sala sentenciadora. No hay razón alguna para que alteremos esas determinaciones.

En cuanto al trámite procesal en sí, concluyó la Sala que en el escrito inicial no se señalaron categóricamente las cantidades ciertas cobradas en concepto de intereses o a cuenta del capital de la deuda, ni se expresó la cuantía líquida de tales intereses mediante una liquidación o contabilidad del movimiento o resultado económico habido durante la vigencia del contrato de anticresis, ni cómo, cuándo y dónde la anticresis se liquidó, terminó y rescindió, ni siquiera se expuso en torno a la misma que no se hubiera abonado dinero alguno a los intereses devengados; que se demandaron intereses por $2,684 y se requirieron por $2,500 cuando en realidad se adeudaban $120.24. Que en el diligenciamiento del requerimiento el Alguacil no certificó que requirió de pago a Gerardo Jorge en su condición de cónyuge viudo o de heredero forzoso de Andrea Rodríguez, ni que hiciera constar al dorso de las copias del mandamiento de requerimiento que entregara, con su firma, la fecha y sitio de su entrega o notificación. Que nunca fueron requeridas o notificadas de pago las menores Luz Virgina y María Isabel Jorge Rodríguez. Que a la fecha de la subasta existía una comunicación del Colector de Rentas Internas en que aparecía que no se habían pagado las contri-

buciones de la finca desde el 1ro. de julio de 1929 al 30 de junio de 1931 señalando una deuda por tal concepto de $1,393.48; que de las copias del escrito inicial entregadas por el Alguacil solamente dos aparecían firmadas por el letrado del acreedor ejecutante; que ninguna de las copias del mandamiento de requerimiento entregadas tenían la firma del Secretario de la Corte de Distrito de Ponce ni el sello oficial de la misma. A la fecha de la subasta y adjudicación judicial a su favor, el acreedor Nereo Pirazzi continuaba en la posesión material de la hacienda y explotaba la misma, y continuó en tal posesión hasta el momento de su muerte en 16 de marzo de 1934.

Fue de opinión también la Sala sentenciadora en lo que respecta al procedimiento, que el acreedor hipotecario cobró, por medio de la ejecución sumaria, intereses que no se adeudaban y procedió al cobro judicial de la deuda no obstante haberse obligado a no recurrir en ninguna ocasión a los tribunales de justicia, y a pesar de que convino que el contrato de anticresis estaría en vigor *por todo el tiempo necesario e indispensable* hasta cobrarse enteramente de los intereses de la deuda y de su principal; que tomando en consideración todas las circunstancias anteriores, coetáneas y posteriores al contrato de anticresis, en unión a su contexto literal, la verdadera intención común de las partes y su propósito u objetivo primordial al convenirlo fue la de conceder a los deudores hipotecantes un plazo más amplio, "todo el tiempo absolutamente necesario e indispensable para dejar cubierto el montante total de los gastos, intereses y créditos" relacionados en la cláusula Primera del contrato de anticresis, y una forma más segura y eficaz para el solvento total de la obligación hipotecaria mediante el desplazamiento posesorio de las fincas en favor de Pirazzi para que las administrara y percibiera las rentas que producían y produjeran en lo sucesivo dichas fincas, y con esas rentas se hiciera pago completo de la deuda y demás cargos.

Concluyó también la Sala que el acreedor hipotecario, como

una consecuencia del contrato de anticresis, renunció al cobro de la deuda hipotecaria por otros medios mientras estuviera en juego y función la dicha anticresis y las fincas se mantuvieran en condición de fructíferas. Que no solamente estuvo dispuesto a postergar, como en efecto postergó, el cobro judicial de la hipoteca, sino que también se obligó "a financiar la explotación de los fundos, adelantando, sin fijarse límite económico para ello (cosa que se encontraban imposibilitados de llevar a efecto sus arruinados deudores), todo el dinero necesario para: (a) gastos de refacción, cultivo, limpieza y recolección de frutos; (b) gastos de reparación de los establecimientos; (c) gastos de construcción de los edificios o construcciones que fueran necesarias; (d) pagar el importe de las contribuciones vencidas o por vencer; (e) gastos de otorgamiento del contrato y su inscripción; (f) todo gasto tendiente a hacer eficaz en la práctica todas y cada una de las cláusulas de este contrato y (g) primas y gastos de aseguro de cualquier índole de los establecimientos, cultivos y cosechas de dichas dos fincas; todas esas operaciones, dada la importancia de las fincas y los daños de ciclón, podían ocasionar desembolsos mayores que la propia deuda hipotecaria. Fue tan lejos en su liberalidad el acreedor que se obligó a capitalizar 'en su totalidad' los intereses, 'siempre que lo producido por las mismas no bastare a cubrirlos totalmente'; y todavía fue mucho más lejos, pactó que las diferencias que pudieran surgir 'no deberán ser sometidas *en ningún caso* a los tribunales de justicia.' " (Énfasis del original.)

A la luz de los hechos y circunstancias que rodearon la constitución del pacto de anticresis, la Sala sentenciadora expuso en sus conclusiones de hecho de la manera siguiente en torno a la cláusula séptima del contrato, aquélla en que el acreedor hipotecario y acreedor anticresista manifestó que el contrato no habría de entenderse ni como parte ni como modificación en ningún particular de lo estipulado en la hipoteca

constituida, la cual seguiría en todo su vigor y eficacia como si dicho contrato no existiera:

"Interpreta el Tribunal la primera parte de la cláusula SEPTIMA del contrato de anticresis referente a la no modificación de lo estipulado en la hipoteca, en el sentido de que ello constituyó una reserva que quiso hacer el acreedor para conservar contra terceros y los propios deudores hipotecantes, la efectividad de la garantía hipotecaria, para que en su día apropiado, una vez llegado el caso de rescindirse o dar las partes por terminado el contrato de anticresis, o para el caso en que se vendieran las fincas, sin pagársele su crédito, él pudiera cobrar, por la vía hipotecaria, el balance de la deuda principal con sus intereses, para cuyo solvento se convino el contrato anticrético.

"La Corte interpreta esta cláusula en unión a los demás pactos, en el sentido de que él no haría efectiva la deuda por la falta de pago de intereses aún en caso de no ser suficientes los frutos, porque se obligó a capitalizarlos; la interpreta además en el sentido de que Pirazzi consideró desde el 10 de abril de 1930 sin fuerza ejecutiva la obligación hipotecaria, mientras se mantuviera en vigencia efectiva y en función extintiva la anticresis, al pactar que en ningún caso sometería a sus deudores a los tribunales de justicia y mucho menos al trámite ex parte y confiscatorio de la vía de apremio y remate a que equivale una ejecución sumarísima hipotecaria; y también la interpreta en el sentido de que él tácitamente se comprometió a no ejecutar la garantía hipotecaria por la falta del seguro de las cosechas de café, toda vez que él mismo se hizo cargo de anticipar todo gasto por primas de ese seguro y que, asímismo quedó condonada o renunciada toda violación al contrato hipotecario, bastante o suficiente en derecho para proceder a su ejecución, en que pudieron haber incurrido los deudores hipotecantes al 10 de abril de 1930, fecha en que se constituyó la anticresis."

A tenor de los hechos determinados, la Sala sentenciadora fue de opinión que se infringieron preceptos de la Ley Hipotecaria y de la doctrina esenciales para la validez de un ejecutivo hipotecario sumarísimo, y en derecho decretó la nulidad del llevado a cabo en este caso. Somos igualmente de opinión que ese ejecutivo sumario no podía prevalecer ante el ataque de su nulidad.

Pasaremos a exponer las razones de esta conclusión, según el derecho aplicable, en todo lo fundamental en completo acuerdo con la exposición de derecho de la Sala, si bien en ocasiones pudiéramos no coincidir de manera absoluta.

■ La anticresis, relación jurídica muy discutida y atacada particularmente en la Edad Media por el Derecho Canónigo que la consideró un vehículo de usura, no admitida por Las Partidas, halló a la larga lugar permanente, aun cuando todavía tiene sus detractores, en los Arts. 1781 al 1786—ed. 1930—del Código Civil, como un contrato real accesorio de garantía, pero independiente, con caracteres propios inconfundibles, distinguible de la hipoteca y de la prenda y contratos análogos.

Dispone el Art. 1781 que por la anticresis el acreedor adquiere el derecho de percibir los frutos de un inmueble de su deudor, con la obligación de aplicarlos al pago de los intereses, si se debieren, y después al del capital de su crédito. Salvo pacto en contrario, dispone el 1782 que el acreedor está obligado a pagar las contribuciones y cargas que pesen sobre la finca, así como el de hacer los gastos necesarios para su conservación y reparación. Las cantidades de tal modo empleadas las podrá deducir de los frutos.

■ Cuando hay desplazamiento posesorio—porque se ha dicho que no es requisito esencial para la validez de la anticresis el que el deudor ponga al acreedor anticresista en posesión de la finca—(véase Resolución de la Dirección General de los Registros de 15 de marzo de 1909) aunque esa es su común característica, habido tal desplazamiento el deudor no puede, tal como reza el Art. 1783, readquirir el goce del inmueble sin haber pagado antes enteramente a su acreedor; reconociéndosele a éste por lo tanto, un derecho de retención. Por el contrario, según el propio artículo, para librarse de las obligaciones que le impone el Art. 1782 el acreedor anticresista sí puede siempre obligar al deudor a que

entre de nuevo en el goce de la finca, a menos que hubiere, pacto en contrario.

■ En cuanto a la disposición final de los derechos de las partes, establece el 1784 que el acreedor no adquiere la propiedad del inmueble por falta del pago de la deuda dentro del plazo convenido, y declara que todo pacto en contrario será nulo. Esto es, en el contrato de anticresis el Código prohibe, bajo pena de nulidad radical, el pacto comisorio. Sin embargo, le concede al acreedor el poder de realización, y al igual que en la hipoteca, le reconoce el *ius distrahendi*, al permitirle que pida, en la forma que previene la Ley de Enjuiciamiento Civil, el pago de la deuda o la venta del inmueble. (²)

―――――――

(²) Una interesante reseña histórica de la evolución de la anticresis nos la ofrece el Rector de la Universidad de Murcia, Don Manuel Batlle Vázquez en su colaboración a la Nueva Enciclopedia Jurídica, bajo la dirección del Dr. Carlos E. Mascareñas (1950), Tomo II, pág. 697. Se ha discutido si la anticresis era un derecho personal o real. Ya no queda duda, por lo menos en nuestro ordenamiento civil, de que es un derecho plenamente real, y un contrato independiente, aunque de tipo auxiliar. De ahí que según nos dice Roca Sastre, *Derecho Hipotecario*, 5ta. ed., 1954, Tomo III, pág. 33 y ss., la anticresis es un derecho real de disfrute y a la vez de realización de valor, "en funciones de garantía *y de pago*." Expone: "Es cierto que la anticresis recae sobre los frutos, pero no concebidos éstos como elementos separados del inmueble que los produce, sino como partes integrantes e inherentes a él. También el usufructo persigue los frutos de una cosa, pero tanto uno como otro derecho atribuyen a su titular el *derecho a percibir los frutos* de una cosa ajena y no éstos aisladamente considerados. Los frutos—dice Ennecerus—corresponden al anticresista, no en concepto de prenda, sino de propiedad. El anticresista se porta respecto de ellos como si fuera propietario de la cosa que los produce. Los puede exigir por la *rei vindicatio* de un poseedor de mala fe. El anticresista tiene derecho a los frutos naturales y civiles; aquéllos los hace suyos, o sea, adquiere su propiedad mediante la separación, y los civiles los adquiere por percepción.

"Por tanto, al constituirse una anticresis se produce una transmisión o desplazamiento de un valor patrimonial consistente en el derecho de disfrutar de una cosa de otro. Tanto es así, que en nuestro Código Civil la anticresis es configurada como un negocio de disposición. El Art. 1781 del mismo no se expresa diciendo que por la anticresis una persona *se obliga* a transmitir el derecho a percibir los frutos, sino 'que el acreedor *adquiere* el derecho de percibir los frutos, de un inmueble.' " (Énfasis del autor.)

Y véanse: Resolución de la Dirección General de los Registros de 30 de junio de 1913, que lo declara parecido al contrato real de hipoteca, y la

 De acuerdo con el récord, es claro que Pirazzi como acreedor anticresista nunca pretendió librarse de las obligaciones del pacto anticrético obligando a los deudores a entrar de nuevo en el goce de la finca, Art. 1783. Lejos de haber pacto en contrario en este sentido, hubo un pacto expreso a tal efecto, pero no hizo uso del mismo. Es igualmente cierto que Pirazzi, como acreedor anticresista, tampoco pretendió hacer uso del derecho de realización que le concede el Art. 1784. En cuanto a este derecho de realización, en primer lugar no había vencido el plazo de la deuda, siendo por otra parte el contrato de anticresis sin tiempo determinado; y en segundo lugar, él no reclamó el pago ni la venta del inmueble acudiendo a la Ley de Enjuiciamiento Civil. La única conclusión restante que el récord permite hacer es que Pirazzi procedió al cobro suma-

---

Resolución de 11 de marzo de 1932:—"Considerando que, prescindiendo de la naturaleza, tan discutida en todas las legislaciones—ya desde la romana— del gravamen anticrético, que vuelve a mirarse con tanto interés en los países de crédito territorial más avanzado, porque sustituye con ventaja a las varias combinaciones de la hipoteca y el usufructo—usufructo de seguridad o garantía—y aun equiparada la anticresis, con carácter de verdadero derecho real, a la hipoteca, por la jurisprudencia de este Centro directivo en cuanto supone igualmente, aparte el característico derecho al percibo de los frutos, *una potencial enajenación de la propiedad del inmueble*, en el caso presente se trata esencialmente de la interpretación de la voluntad del testador, . . ." (Énfasis suplido.)

Valverde no simpatiza con este contrato precisamente porque a pesar de ser uno de garantía, es también de *disposición* y el deudor pierde la posesión del inmueble, y como derecho real, constituye un obstáculo a que el deudor enajene la finca. Además cree que se presta a usura. *Tratado de Derecho Civil Español*, 4ta. ed. 1937, tomo III, pág. 729.

En el estudio sobre la anticresis que aparece en la obra Mucius Scaevola, *Código Civil*, comentado y concordado extensamente, redactado por Don Pedro de Apalategui, Tomo 29—1955—págs. 561 y sigtes., se dice que la definición del Código no es completa porque una de las características del derecho de anticresis está en la *desposesión* de los bienes inmuebles para el deudor, y en que los fundos sean fructíferos. La nota de ser fructíferos los fundos, se dice, es institucional porque precisamente es con los frutos con los que se pretende cancelar la obligación. Y se comenta que hasta que la finca no pasa a poder y *posesión* del acreedor, no ha surgido un derecho *real*. Una vez en posesión del inmueble, surge para el acreedor la facultad de verificar la explotación del fundo, facultad a la que únicamente podría renunciar *entregando la cosa* al deudor.

rísimo de la deuda hipotecaria por incumplimiento de condiciones que permitían una ejecución acelerada no estando vencida la misma, haciendo caso omiso total del pacto anticrético y en franco incumplimiento de las obligaciones que en él se impuso, revestidas, además, de la fe registral, porque la anticresis se inscribió en el Registro. Compárense—Sentencias del Tribunal Supremo de España de 16 de octubre de 1916 y de 23 de junio de 1908.—No sólo ignoró la anticresis, sino que hizo uso de la omisión de hechos que bajo el pacto anticrético a él correspondía realizar, para imputar la omisión a los deudores como único fundamento para la ejecución sumaria acelerada.

Convenimos, por ser enteramente lógica, con la interpretación que dio la Sala sentenciadora a la primera parte de la cláusula Séptima del contrato de anticresis. Particularmente, si se considera que a la fecha en que se otorgó el pacto anticrético, 10 de abril de 1930, el acreedor hipotecario estaba en condiciones de haber ejecutado porque a esa fecha no se había realizado el pago total por adelantado de dos semestres de intereses. Todavía más: está el hecho en el récord de que el contrato de anticresis, por sus pactos y, convenios, no representaba meramente una garantía adicional al gravamen hipotecario, sino que el mismo se pactó, según la clara voluntad de las partes en él expresada, como un vehículo eficaz y eficiente para que el acreedor se cobrara su obligación. De ahí, no sólo el desplazamiento posesorio, sino también las facultades y prerrogativas amplias y extraordinarias que se reservó el acreedor anticresista, punto menos que las del pleno dominio del dueño—diríamos que todas menos la rigurosa de enajenación—a fin de que el pacto anticrético fuera lo más efectivo y seguro posible como tal vehículo de cobro de la deuda, mediante la explotación y administración del fundo.

Quizás no convengamos del todo con la Sala sentenciadora en el sentido de que el pacto de anticresis privó al acreedor de toda acción judicial, aun cuando no devolvió la

posesión. Compárese—la Sentencia de 23 de junio de 1908, *ante.*—Véase: *Bonet* v. *Hernaiz Rozas,* 49 D.P.R. 101 (1935).[3] Podríamos convenir con los recurrentes en que Pirazzi pudo haber llevado una acción judicial de cobro. Pero tal acción debió ser ordinaria, en la forma en que prevenía la Ley de Enjuiciamiento Civil, en donde la administración de la anticresis podía ser a la vez liquidada con intervención y audiencia de los deudores y con rendición de cuentas de los frutos producidos, a la par de la acción de cobro. [4]

Lo que nunca pudo hacer el acreedor compatible con disposiciones pertinentes de la Ley Hipotecaria, dado los pactos y convenciones anticréticos, fue el acudir al procedimiento sumarísimo sin que antes hubiera una liquidación de frutos, o la determinación de la inexistencia de estos. Con mayor razón cuando el principal de la deuda no estaba vencido y fue una ejecución acelerada por incumplimiento de obligaciones que correspondía al acreedor anticresista descargar y no a los deudores; y cuando también invocó para la ejecución sumaria

---

[3] En el caso de *Bonet,* el pacto anticrético se otorgó dos años después de vencido el *principal* de la deuda hipotecaria, y la acción judicial de cobro fue una ordinaria y no sumarísima. A pesar de que se sostuvo la acción judicial, se hizo clara la obligación del acreedor de rendir cuentas de la administración del inmueble por todo el tiempo que lo tuviera en su poder.

[4] Como se observa en Scaevola, *op. cit.,* ante, pág. 567, sobre la anticresis, si bien corresponde al acreedor la explotación económica del fundo, el deudor no es ajeno, ni debe serlo, a dicha explotación, porque de la buena ordenación agrícola, por ejemplo, su deuda puede cancelarse o reducirse notoriamente. Lo lógico es armonizar el interés del acreedor que tiene la posesión y del deudor de acuerdo con los principios de equidad, que en definitiva son los generales del derecho. Así se reconoce en el acreedor como derivado de su derecho de posesión y de percibir los frutos— se sigue comentando—la cualidad de director económico de la explotación, pero no puede desconocerse el derecho del deudor a oponerse a ciertos actos perjudiciales, acudiendo para ello a la Autoridad judicial. Y sigue: "Nada dice el Código sobre el derecho de fiscalización del deudor anticrético, pero esta facultad hay que considerarla *incrustada en la propia médula* de la institución que estudiamos, [anticresis] y hay que reconocerla en todos los momentos del ciclo agrícola o industrial del inmueble . . . *y conocido este líquido resultante, disminuir la obligación en lo concurrente, pues este es el juego de la anticresis.*" (Énfasis nuestro.)

la falta del pago de unos intereses, la realización del cobro de los cuales dependiendo a la vez de la realización de unos frutos producidos y percibidos por el propio acreedor como explotador del fundo; porque como anota Roca Sastre, citando a Ennecerus, la anticresis tiene *función de pago*, y el acreedor recibe los frutos en propiedad, no como garantía, y como si fuera el dueño.

Dispone el Art. 169 del Reglamento Hipotecario en torno al sumarísimo que el escrito inicial enumerará los hechos y las razones jurídicas determinantes de la certeza, la subsistencia y la exigibilidad del crédito y de la competencia del juzgado; señalará *categóricamente las cantidades ciertas cobradas en concepto de intereses o a cuenta del capital de la deuda*, expresando también la cuantía líquida de la reclamación que por el solo acto de iniciar el procedimiento contraerá el acreedor, sujetándose a indemnizar cuantos daños y perjuicios irrogare al deudor o a terceros interesados por *malicia o negligencia en la fiel exposición de los hechos y las circunstancias que ha de apreciar el juez* para autorizar el procedimiento y para continuarlo. Estatuye el Art. 175 del propio Reglamento que los procedimientos sumarios no podrán suspenderse por medio de incidentes, ni por otro alguno a instancia del deudor, salvo en los casos que se enumeran; y que todas las demás reclamaciones que puedan formular, así el deudor como los terceros poseedores y los demás interesados, incluso las que versaren sobre nulidad del título *o de las actuaciones*, o sobre vencimiento, *certeza*, extinción o *cuantía de la deuda*, se ventilarán en el juicio plenario que corresponda sin producir nunca el efecto de suspender ni entorpecer el procedimiento ejecutivo.

En *Ríos* v. *Banco Popular*, 81 D.P.R. 378 (1959), este Tribunal se manifestó así: (pág. 385) "Dada la situación privilegiada del acreedor ejecutante en la acción hipotecaria, los preceptos contenidos en los arts. 38 y 169 antes citados consisten en una imposición absoluta del deber de veracidad

con respecto a los hechos y circunstancias que ha de apreciar el juez para autorizar el procedimiento sumario . . . . Es decir, el procedimiento ejecutivo continuará de ordinario su curso aunque el deudor pueda demostrar la inexactitud o falsedad de los hechos alegados en el escrito inicial. Por eso la ley exige que el acreedor ejecutante diga la verdad al exponer los hechos en el escrito inicial. La 'malicia o negligencia' que menciona el citado art. 169 del Reglamento Hipotecario se refiere tanto a la ocultación o falseamiento de la realidad a sabiendas, como a una falta de veracidad por error de derecho o por descuido en la investigación de los hechos que figuren en el escrito inicial . . . . Así lo hemos declarado reiteradamente, al resolver: (1) que es preciso ajustarse de modo riguroso a los trámites y requisitos del procedimiento sumarísimo, incurriéndose en nulidad de lo actuado al apartarse de los mismos; y (2) que el cobro de intereses excesivos o de otras cantidades que no estén hipotecariamente garantizadas, constituye un error sustancial en perjuicio de los derechos del deudor que vicia de nulidad el procedimiento ejecutivo seguido, aunque tal ilegalidad se deba a un mero error de derecho o a un mero descuido en la investigación de los hechos que figuren en el escrito inicial. [se citan casos]."

En *Sucn. Ramírez* v. *Tribunal Superior*, 81 D.P.R. 357 (1959) (en reconsideración), nos expresamos de manera parecida y añadimos: (pág. 363) "No corresponde al juez investigar o determinar la exactitud o falsedad de los hechos alegados en el escrito inicial para autorizar el procedimiento sumario. Tal responsabilidad recae de lleno sobre el acreedor ejecutante. Y tampoco es necesario para que el procedimiento sea nulo que la conducta del ejecutante pueda equipararse al dolo."

Aquí hubo una conducta más infractora que el mero error o descuido o equivocación que señalan nuestras decisiones. No sólo se incumplió en el sentido formalista de la

exposición del escrito inicial sino que en sustancia hubo una falsa o cuando menos negligente, sino maliciosa, exposición de los hechos y ocultación de hechos, que motivó el auto de requerimiento en una ejecución acelerada. La prueba demostró, en cuanto a la ocultación, que la finca en posesión del acreedor ejecutante había producido frutos para que el acreedor se cobrara intereses, y no era cierto que se debiera la cantidad reclamada en tal concepto. No se mencionó siquiera el abono de intereses de $383.33 contra el semestre del 5 de mayo de 1929 reconocido por el acreedor en la cláusula Octava del contrato de anticresis, lo cual representaba un doble cobro de esta cantidad. Hubo además una exposición a sabiendas falsa en el escrito inicial en cuanto al segundo motivo de ejecución acelerada—el incumplimiento por los deudores de asegurar las cosechas—cuando tal obligación recaía en el propio acreedor. Véanse nuestras expresiones sobre el deber de ser veraz y de no caer en falsedad, so pena de la nulidad del procedimiento, en *Cayol* v. *Balseiro*, 3 D.P.R. 178, pág. 185; *Martorell* v. *Crédito y Ahorro Ponceño*, 42 D.P.R. 655 (1931), págs. 660, 661; *Ayala* v. *Flores*, 50 D.P.R. 873 (1937), pág. 880, citando de *Ojeda* v. *Registrador*, 39 D.P.R. 239 (1929); *Figueroa* v. *Boneta*, 58 D.P.R. 811 (1941), pág. 814; *Salas* v. *Cabassa*, 69 D.P.R. 457 (1948), pág. 464. Y compárense, con la situación del caso de autos, *Miranda* v. *Corte*, 41 D.P.R. 619 (1930), pág. 623, en donde sostuvimos que una fianza hipotecaria en garantía de un arrendamiento no podía ser ejecutada por el sumarísimo sin haberse liquidado antes la responsabilidad del garantizador, y esa responsabilidad tampoco se podía determinar en el procedimiento sumario; *Costas* v. *G. Llinás & Co.*, 66 D.P.R. 730 (1946), pág. 738 y casos ahí citados; *Buil* v. *Banco Popular*, 69 D.P.R. 254 (1948), pág. 264; *Pizá Hnos.* v. *Alfaro*, 7 D.P.R. 104, pág. 108; *Pontón* v. *Sucrs. de Huertas González*, 42 D.P.R. 529 (1931), pág. 535.

La Sala sentenciadora falló correctamente al anular el

procedimiento ejecutivo sumario que tramitó Nereo Pirazzi en virtud del cual se hizo dueño de "La Molina". (⁵)

### *Los Frutos*

A través de un pormenorizado análisis de la evidencia producida según apreciara, dirimiera y creyera la misma, concluyó la Sala sentenciadora que las 264.25 cuerdas de "La Molina" eran todas cultivables, sus suelos de tipo múcara y catalina, profundos y con facilidades de desagüe, y eran apropiados y muy fértiles para el cultivo de café; la localización y topografía de la finca le brindaba buena protección contra ciclones y vientos fuertes, y estaba ubicada en una zona con buena precipitación pluvial; que hasta el 1953 tuvo bajo cultivo de café 165 cuerdas y a partir de ese año 220 cuerdas; la finca siempre ha contado con maquinaria, almacenes y facilidades para la preparación del café con fácil acceso al mercado local. En la finca se ha cosechado además frutos menores; tiene una represa de un manantial que distribuye el agua por gravedad contando con acueducto propio y ha estado dotada de caminos interiores que facilitan el cultivo y la recolección de los cosechos.

Concluyó que su producción de café anual promedio ha sido o debido ser de tres quintales de café por cuerda cultivada y en años buenos ha podido dar de cinco a seis quintales. En guineos y frutos menores ha producido o debido producir un ingreso neto de $1,500 a $2,000 al año y en chinas entre $200 y $250, y ha producido mucho carbón vegetal. La mayoría de las piezas de café estaban sembradas desde antes del

---

(⁵) La Sala expuso en sus conclusiones de derecho varios otros motivos de nulidad, entre ellos, defectos en el trámite del requerimiento de pago por el Alguacil; en los documentos de requerimiento; en que dos de los deudores menores de edad no fueron requeridas de pago; en que el acreedor no podía, por tener los bienes bajo su administración, adquirir la finca a tenor de la prohibición del Art. 1348 del Código Civil, y otros extremos. No es necesario que discutamos y nos manifestemos en cuanto a estos otros particulares, ya que de acuerdo con los motivos de nulidad anteriormente considerados la validez del ejecutivo nunca podría prevalecer.

ciclón de San Felipe. En 1935, la hacienda se hallaba en malas condiciones y no obstante el co-demandado Rafael Pirazzi, que tomó posesión material de la finca a principios de la cosecha de ese año, cosechó 499.46 quintales de café en 165 cuerdas, o sea, más de tres quintales de café por cuerda cultivada. Que "La Molina" ha sido clasificada una entre las diez mejores fincas de café de Puerto Rico habiéndole fijado el co-demandado Pirazzi un valor actual de $200,000. Con 165 cuerdas en cultivo, en los años 1948 y 1949 se aseguraron contra ciclón 500 quintales de café; para el 1951 se aseguraron 650, cerca de cuatro quintales por cuerda; en 1953 se aseguraron 550 quintales; en 1955, con 220 cuerdas en producción, se aseguraron 700 quintales, más de tres quintales por cuerda.

A la luz de esos hechos y de la evidencia pericial desfilada sobre el precio promedio del café en el mercado desde 1928 hasta 1956, el costo de un quintal de café comprendiendo todos sus gastos desde el cultivo hasta ponerlo en el mercado, los costos y valores revelados por la prueba a la cual dio crédito incluyendo declaraciones de nóminas hechas bajo juramento, la Sala sentenciadora concluyó, con base sustancial en el récord, que lo producido o debido producir en café por "La Molina" desde el 2 de junio de 1931, fecha de la subasta, hasta el 31 de diciembre de 1956, deducidos los gastos, fueron $257,824.03. (Esta cantidad deberá corregirse a $257,120.99.) ([6])

---

([6])

| "Años | Quintales | Precio | Qt. Producido | Gastos | Beneficio |
|---|---|---|---|---|---|
| 1931 | 300 | $30.00 | $ 9,000.00 | 2,400.00 | 6,600.00 |
| 1932 | 300 | 17.00 | 5,100.00 | 2,400.00 | 3,100.00* |
| 1933 | 300 | 17.00 | 5,100.00 | 2,400.00 | 3,100.00* |
| 1934 | 300 | 17.00 | 5,100.00 | 2,400.00 | 3,100.00* |
| 1935 | 499.46 | 13.00 | 6,492.98 | 3,054.71 | 3,438.27 |
| 1936 | 495 | 16.00 | 7,920.00 | 3,296.07 | 4,623.93 |
| 1937 | 495 | 16.00 | 7,920.00 | 3,755.53 | 4,164.47 |
| 1938 | 495 · | 16.00 | 7,920.00 | 4,048.62 | 3,871.38 |
| 1939 | 495 | 16.00 | 7,920.00 | 2,460.83 | 5,459.17 |
| 1940 | 495 | 18.00 | 8,910.00 | 2,369.23 | 6,540.77 |

En adición, concluyó la Sala que por el subsidio de café durante los años 1939, 1940 y 1941 hubo un ingreso para los recurrentes, de $4,950 por los tres años; que "La Molina" produjo o debió producir según la prueba, no menos de $1,500 anuales de guineos o sea $39,000 por todos los años envueltos y no menos de $200 al año en chinas o $5,200. También se recibió por concepto de compensaciones, reembolsos por abono, prácticas, etc. desde 1939 hasta el 1955 la cantidad de $5,477.08 para un total de ingresos, con los $257,824.03 ($257,120.99) de café, de $312,451.11 ($311,748.07). A esta cantidad de $311,748.07 debe restarse la suma de $3,160.50 que de acuerdo con las cuentas de albaceazgo de Don Nereo Pirazzi que cubren un período del 17 de marzo de 1934 al 4 de octubre de 1935, fecha en que se rindió la cuenta final, representa partidas de gastos identificados con la hacienda "La Molina", quedando un balance de ingreso de $308,587.57 [6a]

| 1941 | 495 | 18.00 | 8,910.00 | 3,749.98 | 5,160.02 |
|------|-----|-------|----------|----------|----------|
| 1942 | 495 | 25.00 | 12,375.00 | 3,306.71 | 9,068.29 |
| 1943 | 495 | 25.00 | 12,375.00 | 5,045.40 | 7,329.60 |
| 1944 | 495 | 25.00 | 12,375.00 | 5,336.88 | 7,038.12 |
| 1945 | 495 | 30.00 | 14,850.00 | 4,916.72 | 9,933.18* |
| 1946 | 495 | 30.00 | 14,850.00 | 7,176.57 | 7,176.57* |
| 1947 | 495 | 35.50 | 17,562.50 | 9,075.05 | 8,487.45 |
| 1948 | 495 | 35.50 | 17,562.50 | 6,991.91 | 10,570.59 |
| 1949 | 495 | 35.50 | 17,562.50 | 7,273.42 | 10,289.08 |
| 1950 | 495 | 50.00 | 24,750.00 | 9,405.07 | 15,344.93 |
| 1951 | 495 | 52.00 | 25,740.00 | 9,281.46 | 16,458.54 |
| 1952 | 495 | 52.00 | 25,740.00 | 7,872.69 | 17,867.31 |
| 1953 | 495 | 55.00 | 27,225.00 | 9,852.97 | 17,372.03 |
| 1954 | 495 | 63.00 | 30,180.00 | 11,454.53 | 18,725.47 |
| 1955 | 660 | 54.00 | 35,640.00 | 12,272.57 | 23,367.43 |
| 1956 | 660 | 63.50 | 41,910.00 | 12,272.57 | 29,637.43 |

257,824.03"

* Hubo error matemático en las restas de estas partidas. La partida final de $257,824.03 deberá leer $257,120.99. Al devolverse el mandato se tomará en cuenta este hecho en el trámite de ejecución.

[6a] Los demandantes objetaron esta prueba por no haber sido ellos parte del albaceazgo y no haber tenido oportunidad de impugnar esas partidas. Técnicamente puede que tuvieran razón pero tratándose de cuentas

■ Como es natural en tales casos, la prueba de una y otra parte fue conflictiva en cuanto a lo producido. Según el testimonio oral del recurrente Rafael Pirazzi, la finca produjo menos café y hubo mayores gastos y costos. Aparte de su testimonio, el recurrente no aportó evidencia documental, que se presume debió haberla, en apoyo de su declaración, tales como récords de producción, jornales pagados, almudes recogidos, récords de ventas y liquidación del café, contratos y cualquier otra evidencia documental por el estilo. Tampoco produjo el testimonio o los récords de terceras personas con quienes él traficara la producción de la finca. La Sala sentenciadora dirimió el conflicto en la evidencia a estos efectos, hizo un cuidadoso análisis de la misma, sus apreciaciones e inferencias de la pericial son razonables y sus conclusiones, no importa los criterios discrepantes, encuentran sustancial y preponderante apoyo en el récord. No tenemos razón para intervenir con sus conclusiones de hecho sobre el particular. Cf. *Costas* v. *G. Llinás & Co.*, ante, a las págs. 741 y ss.

Se determinó por la Sala que como gastos de conservación y mejoras, según la evidencia ante ella, se pagaron $6,133.99 de contribuciones sobre la propiedad incluyendo lo adeudado a la fecha de la subasta y hasta el 30 de junio de 1956; $5,028.48 por abonos utilizados desde el año 1941, tomando como base 25 toneladas anuales a un costo de $46.56 por tonelada, más la aportación del gobierno en materia de abonos; $2,500 por razón del costo de reproducción de la casa-residencia de la finca y $12,454.13 por concepto de primas de seguro cafetalero, para un total de $26,116.60. La Sala concluyó que los allí demandados no habían aportado prueba en cuanto al costo de otras mejoras, obras y reparaciones. Cf. *Nogueras* v. *Muñoz*, 67 D.P.R. 441 (1947), pág. 450, en donde expusimos, en circunstancias parecidas, que un de-

---

rendidas a un tribunal por un albacea con anterioridad a la iniciación de este pleito, somos de opinión que deben considerarse dichas partidas de gastos.

mandado tenía derecho bajo el Art. 384 del Código Civil a ser reintegrado de los gastos necesarios hechos para la conservación de la finca, pero que el demandado tenía el peso de la prueba para demostrar con claridad y en detalle exactamente cómo se invirtió el dinero y por qué fue necesario o aconsejable invertirlo. Ante la naturaleza general de la prueba en ese caso, y el conflicto de evidencia, no se concedió tal reclamación. Y véase *Concepción* v. *Latoni*, 51 D.P.R. 564 (1937), a la pág. 580:—"Es cierto que correspondía a los demandantes probar su alegación afirmativa en cuanto a las sumas realmente recibidas por el demandado por concepto de alquileres. Pero no es menos cierto que el demandado, como poseedor de las fincas, estaba en mejores condiciones que los demandantes para saber lo que las mismas produjeron durante al tiempo de su posesión. Pudiendo haber ayudado al esclarecimiento de la verdad, compareciendo ante la Corte a declarar sobre los hechos, optó por no hacerlo." ([6b])

---

([6b]) La Sala sentenciadora hizo constar, en cuanto a los gastos necesarios invertidos en jornales y personal, que los tomó de las nóminas anuales rendidas bajo juramento en nombre del recurrente Rafael Pirazzi al Fondo del Seguro del Estado desde el año 1935 al año 1956, documentos estos que constituyen el Exh. 67 de la parte demandante. En cuanto a los años de 1931 a 1934 hizo su determinación a base del costo promedio de $8 por quintal de café cubriendo desde su cultivo hasta ponerlo en el mercado, según prueba pericial y no pericial que tuvo ante sí y le mereció crédito.

El recurrente Rafael Pirazzi se queja de las determinaciones de la Sala sentenciadora en lo que respecta a la producción de la finca, sus gastos y sus ingresos e impugna lo concedido por concepto de frutos por creer que aun cuando estos procedieren debieron concederse en cantidad menor.

La situación que el récord revela en cuanto a la posición del recurrente es que su prueba testifical aportada—sobre todo en ausencia de aquella otra oral y documental allí disponible según el récord, que él estaba en condiciones de producir y no produjo—no ofrece aquel grado de persuasión y convencimiento que se requeriría para dejar sin efecto, en apelación, las determinaciones de la Sala sentenciadora hechas a la luz de prueba pericial y no pericial preponderante. Esa situación nos impide concluir que las determinaciones en cuanto a frutos de la Sala sentenciadora no tengan un apoyo sustancial en el récord o que, aun teniéndolo, sean contrarias a un balance más racional de toda la prueba aportada por una y por otra parte.

A la anterior partida de $26,116.60 de gastos de conservación y mejoras adicionó la Sala $83,303 por concepto del capital de $23,000 y los intereses al 10% adeudados hasta el 5 de mayo de 1957, para una obligación total de los deudores hipotecarios a esa fecha de $109,419.60 que declaró extinguida y compensada hasta donde concurrió con los frutos a devolver. Arts. 1149 y 1156 Código Civil. Cf. *Fuentes* v. *Aponte*, 63 D.P.R. 194 (1944), pág. 199.([7])

Como cuestión de derecho concluyó la Sala que los recurrentes, como únicos y universales herederos del acreedor ejecutante Nereo Pirazzi, estaban obligados solidariamente a devolver la hacienda "La Molina" y sus frutos percibidos o debidos percibir en exceso de la deuda hipotecaria. Fue de opinión que los demandados, como herederos responsables por las obligaciones de su causante no ocupaban la posición de poseedores de buena fe y adquirieron los bienes de la herencia sujetos a las obligaciones contraídas por el causante.

La contención principal de los recurrentes, ante este Tribunal, es que aun cuando el ejecutivo fuera nulo, como en verdad se ha concluido que lo fue, ellos no vienen obligados a devolver frutos, amparándose fuertemente en el Art. 371 del Código Civil—ed. 1930—que dispone:

"El que suceda por título hereditario no sufrirá las consecuencias de una posesión viciosa de su causante, si no se demuestra que tenía conocimiento de los vicios que la afectaban; pero los efectos de la posesión de buena fe no le aprovecharán sino desde la fecha de la muerte del causante."

El anterior precepto del Código parte del supuesto de una posesión viciosa del causante. En circunstancias ordinarias, tendríamos que resolver que la posesión del causante Nereo Pirazzi entre la fecha en que se adjudicó la finca en subasta y hasta el momento de su muerte, no podría ser sino una pose-

---

([7]) Los intereses computados cubren hasta el 5 de mayo de 1957. La sentencia, sin embargo, se dictó el 28 de mayo de 1957. Deberá hacerse el reajuste necesario en favor de los recurrentes.

sión viciosa, sin buena fe ni justo título, dada la nulidad de la ejecución sumaria. El problema entonces se reduciría a determinar si los recurrentes, que adquirieron a título hereditario, habrían de sufrir o no las consecuencias de esa posesión viciosa a partir de la muerte del causante, dependiendo todo de que se hubiere demostrado que ellos tenían o no tenían conocimiento de los vicios que la afectaban. Sobre este particular ambas partes nos ofrecen en sus alegatos una extensa e ilustrada discusión con amplia cita de autoridades y de jurisprudencia, tratando de sostener los recurrentes que su posesión no era viciosa, y los recurridos, que lo era, respecto de la obligación de devolver frutos.

Si tuviéramos que resolver la cuestión como se ha planteado, tal vez tendríamos que llegar a la conclusión, por lo que surge del récord, que los recurrentes tenían suficiente conocimiento de los vicios que habrían afectado la posesión derivada por su causante como consecuencia del ejecutivo sumario. Hay varios hechos en el récord que harían permisible esa conclusión. El principal de ellos, que el contrato de anticresis se inscribió en el Registro con efecto *erga omnes* de sus pactos y convenciones, y no aparecía cancelado a la fecha en que se inició el ejecutivo. (8)

---

(8) Ya se ha dicho, además, que los recurrentes fueron únicos herederos testamentarios, pero la adjudicación de "La Molina" a Rafael Pirazzi fue el resultado de un pleito de la herencia entre los hermanos. El distinguido letrado que lo representó en aquel pleito y lo representa en éste declaró que cuando llegó el momento de determinar si debía o no aceptar "La Molina" en pago del haber de su cliente Rafael Pirazzi, examinó personalmente el Registro, y según determinó: "podría tomar la finca Hacienda Molina sin riesgo ninguno, porque, a mi juicio, el Registro no demostraba que existiera ningún vicio de nulidad, ni que existiera ningún gravamen que pudiera afectar el título del señor Pirazzi sobre esa finca. Como del Registro aparecía que el título del señor Nereo Pirazzi había sido adquirido por ejecución de hipoteca, examiné el procedimiento de ejecución de hipoteca en la Corte de Distrito, antes, hoy Tribunal Superior de Ponce, y como abogado llegué a la conclusión de que el procedimiento de ejecución había sido válidamente tramitado y que don Nereo Pirazzi había adquirido un buen título sobre la finca en ejecución, a pesar de que del Registro de la Propiedad aparecía que entre don Nereo Pirazzi y los de-

Sin embargo, ante la situación peculiar que presentan los hechos de este caso, la cuestión de la posesión viciosa o no del causante y luego de los recurrentes como herederos, se orienta en otra dirección del derecho a ser aplicado. Somos de opinión que el Art. 371 del Código Civil no rige esta cuestión litigiosa y pasamos a exponer las razones:

Declarada la nulidad del ejecutivo sumario tramitado por el acreedor Nereo Pirazzi, y su inexistencia, fueron inexistentes en derecho la subasta y la escritura de venta judicial en virtud de las cuales Nereo Pirazzi adquirió e inscribió el dominio de "La Molina" en concepto de dueño. Inexistente el ejecutivo, jurídicamente las cosas se situaron en la misma situación en que estaban al comenzarse el procedimiento. Véase: *Fuentes* v. *Aponte*, 62 D.P.R. 722 (1943), pág. 729:—"La sentencia que declaró nulo el procedimiento ejecutivo tuvo el efecto legal de anular *ab-initio* el título de dominio que había adquirido Fuentes y restablecer el *status* que existía antes

---

mandados, mejor dicho, los deudores hipotecarios habían celebrado un contrato de anticresis y que se había ejecutado la finca después de otorgado ese contrato anticresis. El título de adjudicación en ejecución fue debidamente inscrito en el Registro y del Registro aparecía que se habían citado o notificado personalmente a todos los interesados deudores." . . . "Lcdo. Pierluisi: Una sola pregunta. ¿Usted leyó la escritura de anticresis? Lcdo. Martínez Rivera: Bueno, yo leí el expediente. Del expediente de ejecución de hipoteca aparecía una copia de la escritura anticresis; además aparecía del Registro las condiciones del anticresis." . . . "Lcdo. Pierluisi: ¿En el Registro vió todas las condiciones del anticresis? Lcdo. Martínez Rivera: Sí, señor. Lcdo. Pierluisi: ¿Y en el expediente del ejecutivo hipotecario? Lcdo. Martínez Rivera: Sí, señor. Es más que recuerdo que el Lcdo. Olivieri me habló que se había iniciado una acción de nulidad de ejecutivo hipotecario y me explicó como había terminado aquel asunto, y del Registro no aparecía ninguna anotación de nulidad de ejecutivo hipotecario. Lcdo. Pierluisi: De manera que debo entender que usted ha tenido que examinar esa escritura anticresis en todos sus detalles, o sea la escritura que estaba unida al expediente de ejecutivo hipotecario. Lcdo. Martínez Rivera: Sí, señor; todo el expediente lo examiné antes de aconsejarle a Rafael Pirazzi que tomara la finca."

La Sala sentenciadora hizo constar en cuanto a este extremo que los demandados tenían también en su poder los libros del causante de donde podrían enterarse y que Rafael Pirazzi era de profesión contador, conocedor de la materia.

de dictarse la sentencia en dicho procedimiento ejecutivo. En contemplación de la ley Aponte en ningún momento perdió su derecho al goce y disfrute de su propiedad."

Mantuvo su efecto legal la deuda hipotecaria, así como las demás obligaciones de los deudores, y por lo tanto perdió su efecto jurídico la nota en el Registro de cancelación de la hipoteca por confusión de derecho. *Costas* v. *G. Llinás*, ante, pág. 746 y *F. Rodríguez Hnos.* v. *Aboy*, 66 D.P.R. 525 (1946), pág. 549. Por igual razón, inexistente el ejecutivo, quedó sin efecto legal la nota en el Registro de cancelación del contrato de anticresis por confusión de derecho, hecha en virtud de dicho procedimiento. En su consecuencia conservó toda su eficacia jurídica el contrato de anticresis.

Considerando que el acreedor ejecutante se encontraba en la posesión legal del inmueble ejecutado, en virtud del pacto anticrético, al comenzar el procedimiento y al momento de la subasta y al inscribir su supuesto título de dominio, siendo como fue inexistente dicha subasta y dicho título, *strictissimi juris* su posesión al morir no era viciosa por cuanto la derivaba del contrato de anticresis que nunca perdió su eficacia. La posesión civilísima que heredaron los recurrentes por el acto mismo de la muerte del causante participaba, por lo tanto, de igual naturaleza. (9)

---

(9) Dispone el Art. 369 del Código Civil que la posesión de los bienes hereditarios se *entiende transmitida* al heredero *sin interrupción y desde el momento de la muerte del causante,* en caso de que llegue a adirse la herencia, y que aquél que válidamente *repudia* una herencia se entiende que no la ha poseído en ningún momento.

Por otra parte estatuye el 360 que la posesión *natural* es la tenencia de una cosa o el disfrute de un derecho por una persona, y la *civil* es esa misma tenencia o disfrute *unidos* a la intención *de haber la cosa o derecho como suyos.*

Según el Art. 362, la posesión puede tenerse en el aspecto de dueño, o en el de tenedor de la cosa o derecho para conservarlo o disfrutarlo, *perteneciendo el dominio a otra persona.* Y véanse Arts. 599 y 601.

Bajo la anticresis, Nereo Pirazzi tenía la posesión natural del Art. 360, parecida a la posesión del arrendatario, y ésa la transmitió a sus herederos. Comenta sobre el particular el catedrático Don Guillermo G. Valdecasas, en su obra *La Posesión,* (1953), pág. 41, que el heredero adquiere por

La obligación que la Sala sentenciadora impuso a los recurrentes de devolver "La Molina", aun cuando en algún momento los considerara como poseedores de mala fe como consecuencia del ejecutivo sumario inexistente, lo es en estricto derecho por razón de la obligación que ellos tienen como herederos, de cumplir con las obligaciones de su causante respecto a los pactos y convenciones de la anticresis. Estas obligaciones no terminaron, como sostienen los recurrentes, ni con la muerte de la deudora Andrea Rodríguez, esposa de Gerardo Jorge, ni con la muerte del causante. Cf. *Silva* v. *Doe*, 75 D.P.R. 209 (1953), pág. 216, y casos citados. Además de que el Art. 1209 dispone que los contratos producen efecto entre las partes que los otorgan *y sus herederos*, excepto en cuanto a éstos cuando las obligaciones que proceden del contrato no son transmisibles por su naturaleza, o por pacto o por disposición de ley, aquí hubo pacto expreso, en el contrato de anticresis, que obligaba a los herederos de las partes, inscrito en el Registro. La cláusula Décima dispuso que los herederos, sucesores y cesionarios de los comparecientes vendrían obligados a respetar todas y cada una de sus cláusulas. Como herederos de las obligaciones de su causante, los recurrentes están obligados solidariamente. *Morales* v. *Cabrera*, 53 D.P.R. 94 (1938), pág 103. Arts. 957, 599, 601 del Código Civil. Lo dicho dispone de la contención particular de Josefina Pirazzi al efecto de no ser responsable ella por cuanto a

---

ministerio de la ley, sin necesidad de acto material alguno, la posesión que tuviese el causante en el momento de su muerte, si es que el heredero no repudia la herencia. Se transmite el derecho de posesión, *"ius possessionis"*, y la posesión que adquiere el heredero *es la misma del causante*, en concepto de dueño, *o en otro distinto*. De igual manera se manifiesta Sánchez Román, *Derecho Civil*, Vol. 3, 2a. ed., pág. 471.

Pudiera pensarse que producidos frutos suficientes para cobrarse la deuda hipotecaria de ahí en adelante la posesión de los recurrentes fuera de mala fe—cf. *Lluberas* v. *Mario Mercado e Hijos*, 75 D.P.R. 7 (1953), pág. 16, el caso de un arrendatario en posesión natural que no devolvió la propiedad al expirar el contrato. Ello no obstante no afectaría la disposición final de los frutos, ni haría aplicable el Art. 371, pues en tal caso la posesión viciosa de los recurrentes sería *per se* y no heredada.

partir de 1935 el poseedor fue su hermano, independiente de cualquier reajuste hereditario entre ellos.

Habiendo demostrado la evidencia que "La Molina" produjo frutos suficientes y en exceso para pagar la deuda hipotecaria y cubrir otros extremos convenidos, los recurrentes están obligados a devolver, junto con la finca, el exceso de los frutos a los que, inexistente el ejecutivo sumario, en momento alguno dejaron de ser dueños de la propiedad.

El recurrente Rafael Pirazzi sostiene que él tiene derecho a cobrarse ciertas cantidades sustanciales por sus servicios en la atención de la finca. El contrato de anticresis no concedía tal derecho a Nereo Pirazzi. Aun fuera del contrato, considerado como poseedor de mala fe, tampoco tendría ese derecho. Cf. *García* v. *Aguayo*, 45 D.P.R. 845 (1933), pág. 851; *F. Rodríguez Hnos. & Co.* v. *Aboy*, (Per Curiam) 66 D.P.R. 722 (1946).

Finalmente sostienen ambos recurrentes que ellos tienen derecho a recibir $349,881.75 por concepto de intereses, en lugar de $59,800 computados, quedando entonces los demandantes recurridos como deudores de ellos. Esto es, invocan un pacto de anatocismo bajo el pacto anticrético, capitalizando intereses y cargando intereses sobre los capitalizados. Aparte de que el anatocismo es repudiado, basta considerar la propia cláusula Séptima del contrato de anticresis y el hecho de que la finca producía frutos para cubrir los intereses, para que desestimemos esta reclamación.

### La Prescripción

Los recurrentes invocan la prescripción, tanto adquisitiva del dominio como la extintiva de la acción de los demandantes recurridos. En tanto nos referimos a la declaración de nulidad del ejecutivo sumario hipotecario, la acción encaminada a dicha declaración es imprescriptible según lo hemos resuelto, como también hemos resuelto firmemente que no prescribe nunca la acción sobre contratos de nulidad

548

absoluta o inexistentes, Véanse: *González* v. *Sucn. Díaz*, 69 D.P.R. 643 (1949), pág. 654, y casos ahí citados; *Sucrs. de Huertas González* v. *Díaz*, 72 D.P.R. 537 (1951), pág. 541; *Costas* v. *G. Llinás*, ante, pág. 741; *Oliver* v. *Oliver*, 23 D.P.R. 181 (1915), pág. 190 y ss.; *Sucn. Trías* v. *Porto Rico Leaf Tobacco Co.*, 50 D.P.R. 91 (1936), pág. 95 y casos ahí citados; *Crespo* v. *Schluter*, 58 D.P.R. 834 (1941), pág. 839; *Gaztambide* v. *Sucn. Ortíz*, 70 D.P.R. 412 (1949), pág. 426. Y véanse: *Sucn. Ramírez* v. *Tribunal Superior* y *Ríos* v. *Banco Popular*, ante, a las págs. 363 y 395 respectivamente. [10]

■ Sostienen los recurrentes que ellos consolidaron el dominio por su posesión de más de diez y de veinte años. Si partiéramos de una posesión viciosa del causante y de ellos por tener conocimiento de los vicios, como consecuencia del sumario hipotecario, no tendrían ni la buena fe ni el justo título que requieren la prescripción ordinaria. Sin embargo, no tendríamos que resolverlo puesto que ya hemos visto que la posesión del causante a su muerte y la de los herederos era una natural en virtud del contrato de anticresis, que nunca pudo perder su eficacia jurídica como consecuencia del ejecutivo sumario inexistente en derecho. A este respecto, dispone el Art. 376 que "Sólo la posesión que *se adquiere y se disfruta en concepto de dueño* puede servir de título para adquirir el dominio", precepto éste que lo reafirma el Código en el

---

[10] Aun cuando se aplicara algún término de prescripción según sostienen los recurrentes, hemos dicho que la acción sobre nulidad de un ejecutivo sumario participa de la naturaleza de una acción *real*. *Sabater* v. *Union Central Life Ins. Co.*, 41 D.P.R. 241 (1930), pág. 243. Dispone el Art. 1863 que las acciones reales sobre bienes inmuebles prescriben a los 30 años—sin perjuicio de la prescripción adquisitiva—período éste que no había transcurrido desde la fecha de la subasta, 2 de junio de 1931, hasta cuando se interpuso la presente demanda en 19 de diciembre de 1955. Si se considera además que los recurrentes venían obligados a devolver la propiedad a sus dueños una vez recibieran frutos suficientes para cobrarse la deuda hipotecaria, en cuanto a la devolución de "La Molina" ésta era una acción claramente reivindicatoria bajo lo dispuesto en el tercer párrafo del Art. 280 del Código Civil: "El propietario tiene acción contra el tenedor y el poseedor de la cosa para reivindicarla."

1841—en concepto de dueño—a los efectos de la prescripción adquisitiva, aun para la extraordinaria que no requiere de buena fe ni de justo título. Véanse Arts. 1857 y 1859.

Nulo e inexistente el título del causante adquirido por venta judicial, él y sus herederos siempre tuvieron la posesión *in natura* que les daba el contrato de anticresis, nunca en concepto de dueños, sino mediante la licencia que les confería dicho contrato. Véanse: *Dávila* v. *Córdova,* 77 D.P.R. 136 (1954), págs. 141 y ss.; *Sucn. Rosa* v. *Sucn. Jiménez,* 77 D.P.R. 551 (1954), págs. 556. y ss. Por consiguiente, siendo su posesión una de *licencia* del dueño, los recurrentes nunca podían adquirir título por prescripción adquisitiva, ni aun cuando se tratara de la extraordinaria.

Sostienen también los recurrentes que la acción para liquidar el pacto anticrético estaba prescrita porque el término para la rendición de cuentas es de quince años. No tienen razón. Dispone el Art. 1872 que el tiempo de la prescripción de acciones para exigir rendición de cuentas corre desde el día en que *cesan en sus cargos* los que debían rendirlas, y el correspondiente a la acción por el resultado de las cuentas desde la fecha en que fue éste reconocido por conformidad de las partes interesadas.

En este caso el pacto anticrético no tenía término fijo de duración ni nunca se terminó o rescindió, ni la posesión fue devuelta bajo el mismo. Tampoco la acción aquí llevada fue una propiamente de rendición de cuentas bajo la anticresis. La liquidación de los derechos y obligaciones de las partes bajo dicho pacto es la consecuencia de la acción traída para reivindicar la propiedad y del hecho de que la finca produjo frutos suficientes y en exceso para pagar la deuda hipotecaria.

*El fallo pronunciado por la Sala sentenciadora fue acertado y correcto en los hechos y en la doctrina y será confirmado en ambos extremos, sujeto a las leves modificaciones señaladas en el curso de esta opinión.*

Los Jueces Asociados Señores Hernández Matos y Blanco Lugo no intervinieron.